432 P.2d 904

Max ORTEGA and Amelia Ortega, his wife, Appellants,

v.

STATE of Arizona ex rel. Justin HERMAN, Director, Arizona Highway Department, Appellee.

1 CA–CIV 245.

Court of Appeals of Arizona.

Nov. 2, 1967.

Review Denied Dec. 19, 1967.

Alexander Russin, Show Low, and Evans, Kunz & Bluemle, by Donald R. Kunz, Phoenix, for appellants.

Darrell F. Smith, Atty. Gen., by H. K. Mangum, Sp. Asst. Atty. Gen., for appellee.

STEVENS, Judge.

The basic issues presented to the Court relate to the matter of severance damages in connection with the construction of a limited access interstate highway which was not constructed on the old right-of-way and which new highway bisects the land of the owners. The condemnor is the State of Arizona. The condemnees are Mr. and Mrs. Ortega who are the appellants in this Court. Mr. and Mrs. Ortega will be referred to as the "owners".

Lupton, Arizona, lies just westerly from the State line of the State of New Mexico. At the location of the property in question, U.S. Highway 66, which is the old highway, runs generally northeasterly and southwesterly. The new highway, which is Interstate 40, roughly parallels U.S. 66 and is northerly therefrom. The land of the owners is patented land and patented land in this area is the exception rather than the rule.

The complaint in condemnation seeks title to the land over which the new right-of-way will pass,

"* * * together with all access rights appurtenant and incident to the remaining real property abutting on the State right of way as are required to effectuate said resolution, reserving, however, to the defendant owners, their heirs, successors and assigns access to the two-way frontage road parallel and adjacent to the course described * * * which frontage road will be connected to the main thoroughfare of the Interstate Highway at the Lupton Interchange; and further reserving to the defendant owners, their heirs, successors and assigns access to a double 10-foot by 10-foot concrete drainage structure under the highway * * * for the privilege of moving livestock, equipment, machinery, vehicles and pedestrians, beneath said highway."

An illustrative diagram was incorporated in the opening brief of the appellants and it is reproduced as a part of this opinion. The diagram shows the after situation. In the

before situation the north remainder and the south remainder were one contiguous parcel of land. In the after situation the two remaining parcels were effectively separated from each other. To the east of the north remainder across private land without easements or right of use, there is a bladed strip having the appearance of a roadway. The area in the map wherein numerous dots have been placed is a wash with generally steep banks. The culvert under Interstate 40 consists of two concrete drainage structures each of which is 10 ft. wide and 10 ft. high. Under limited circumstances these drainage structures may be utilized as a means of travel between the south remainder and the north remainder. There is an interchange approximately 1450 feet east of the owner's property affording access to and from Interstate 40 whereby one can reach U.S. 66 and can also reach the bladed so-called roadway which runs to the north remainder.

The map discloses the approximate location of buildings in the south remainder and these buildings together with other structures, which were located on the land now occupied by Interstate 40, were utilized by the owners in connection with their trading post business. In the before situation, the owners utilized the combined unit area of the south remainder, the north remainder and the land now occupied by Interstate 40, in connection with the operation of their business. A material portion of their business was Indian trade and the Indians frequently used the land area in the north remainder and southerly therefrom for yabachais, sings and squaw dances. The testimony discloses that patented land is desired by the Indians for these purposes. The availability of this area and the use thereof by the Indians resulted in a considerable volume of business. There was testimony that much of this Indian use was lost as a result of the construction of Interstate 40 and the division of the owner's land into the areas described as the north remainder and the south remainder.

In relation to the right of condemnation, Section 17 of Article 2 of the Arizona Constitution, A.R.S. states, in part:

"* * * No private property shall be taken or damaged for public or private use without just compensation * * *."

This constitutional provision is supplemented by the statutory law of the State and A.R.S. Section 12–1122 specifies, in part:

"A. The court or jury shall ascertain and assess:

"1. The value of the property sought to be condemned * * *

"2. If the property sought to be condemned constitutes only a part of a larger parcel, the damages which will accrue to the portion not sought to be condemned by reason of its severance from the portion sought to be condemned, and the construction of the improvement in the manner proposed by the plaintiff. * * *"

■ It is well established in Arizona that when the new highway is not constructed over the right-of-way of an existing highway and is located upon a new and different land area, there are no access rights which are thereby destroyed or impaired so that no compensation is payable for the loss of the non-existent access rights to the new roadway. State ex rel. Morrison v. Thelberg, 87 Ariz. 318, 350 P. 2d 988 (1960); and Busby v. State ex rel. Herman, 101 Ariz. 388, 420 P.2d 173 (1966). It is our opinion that the above quoted portion of the complaint which alleges "together with all access rights, appurtenant and incident to the remaining real property abutting on the State right of way * * *" was inserted to make it doubly clear that in the after situation the abutting property would not have access rights to Interstate 40.

There is frequently a difference of opinion between the experts who testify, and a further difference of opinion in the testimony of the owners, as to the value of the land taken and as to the severance damages.

This case was no exception. The appraisers combined three methods of evaluation to reach their respective opinions using the income approach, the replacement and depreciation approach, and the comparison of comparable sales. The income approach was a material element in the opinion expressed by the owners. The expert who testified for the State allocated greater values to the land adjacent to U.S. 66 than he did to the lands further removed therefrom, that is, the land contained in the north remainder. The appraiser who testified for the owners expressed the opinion that the highest and best use required the unit value approach, that is, that the lands farther removed from U.S. 66 had the same acreage value as the lands which bordered on U.S. 66 because of the manner of the use of the entire area.

An overall reading of the instructions fairly required the jury to find not only the fair market value of the land which was taken but to also return a verdict in some amount for severance damage. It is the severance damage aspect of the case which is the thrust of the appeal.

Rule 51 of the Rules of Civil Procedure, 16 A.R.S., relates to instructions in civil cases. Rule 51(a) specifies, in part:

"* * * No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of hearing of the jury."

The owners tendered their Requested Instruction No. 12 which reads as follows:

"In this action the State of Arizona seeks to condemn for highway right-of-way purposes not only a portion of Defendants' land, but also Defendants' access and abutters' right as set forth in Plaintiff's Complaint, appurtenant and incident to the lands of said Defendants abutting upon said right-of-way, for the full distance of Defendants' land frontage upon said right-of-way as it crosses de-

fendants' land. The Court has held as a matter of law that it is entitled to do so. "You are, therefore, instructed that you shall include in your verdict severance damages in such an amount as you believe from a preponderance of the evidence the remaining lands of Defendants have been damaged by the taking of such access and abutters' rights."

The Court refused the instruction and the attorney who represented the owners at the trial made the following record in connection with the refusal to give this requested instruction:

"MR. PLATT: With relation to Defendants' Instruction No. 12, we object to the Court's refusal to give Instruction No. 12, on the ground and for the reason that there is evidence before the Court as to loss of access to the remaining lands lying north and east of the land abutting on U. S. Highway No. 66, and that the separation of these two tracts of land by the re-allignment (sic) of Interstate 40 thus deprives the Defendants of access from U. S. 66 to the other land by reason of the taking, as alleged in Plaintiff's Complaint, of all access and abutters rights to the Interstate system, and on the ground that there is a clear showing in the evidence that there is no means of access to said property from designated Interchanges on Interstate 40."

The owners did not tender an instruction in the language of the objection.

Without objection, the Court gave the owners Requested Instruction No. 9, as modified, which is as follows:

"I instruct you that real property is defined as the right to the possession, use and disposition of a particular area of land, together with other rights over contiguous and surrounding areas affecting the use of the particular area of land. Such other rights include the right of access to and from the particular area of land from and to the then existing public highway, U. S. 66. If this right of access is diminished or restricted as

a result of a condemnation proceedings then the defendants are entitled to damages against the State of Arizona resulting from such injury to his access to the remainder of the property not condemned."

■ In our opinion the tendered instruction is confusing. The term "access" had been used throughout the trial and in the other instructions to indicate the right of ingress and egress to the highway. It had not been used to describe or indicate the privilege of going from the north remainder to the south remainder. The reduction or elimination of access from the north remainder to U. S. 66 was adequately covered by the owners Requested Instruction No. 9. In relation to the separation of the north remainder from the south remainder, the court gave State's Requested Instruction No. 9, which was given without objection, and which states, in part:

" * * * [B]ut you are to consider any severance damages that you find to have been sustained to the defendants' remaining lands by reason of the separation of the same into two parcels and any effect this may have upon the market value of such remaining parcels."

■ A portion of the State's Requested Instruction No. 8 advised the jury that they could not consider the diversion of traffic from U. S. 66 to Interstate 40 and that:

" * * * [A]ny business income loss resulting therefrom is what is termed as consequential damage and is noncompensable."

The owners objected to the quoted portion of the instruction urging in the trial court and in this Court that there was no evidence of income loss and "that no instruction should be given relating to matters on which there is no evidence submitted". We are in agreement with the quoted portion of the objection as a general statement of law. In City of Phoenix v. Wade, 5 Ariz.App. 505, 428 P.2d 450 (1967), we held that under some circumstances it is appropriate to instruct that certain situations which might otherwise result in damage to the property of the owner are to be excluded by the jury in determining the issue of damages. In the case now before us there was extensive evidence as to business income in the before situation and in the after situation, the evidence being received in connection with the income approach in determining fair market value. Both appraisers used the books of account of the owners. Mrs. Ortega testified that in the before situation the combined property had a value of $200,000 and that in the after situation, the value had been reduced to the sum of $75,000 so that the highway construction depreciated the value of the property by $125,000. We quote from her testimony:

"Q Now, unquestionably, Mrs. Ortega, there was a loss as a result of this change of the highway, is that right?

"A That is right.

"Q What was that loss, in your opinion? You understand my question, the by-passing it?

"A I would think it would be $100,000.

"Q You think a buyer would pay $100,-000 less because they changed the highway?

"A That is right.

"Q Have you deducted that $100,000 from the $125,000 for any reason?

"A Well I have been told I couldn't get that money for that loss.

"Q And who advised you of that?

"A My lawyer.

"Q Was it me?

"A You.

"Q So, you have deducted $100,000 from the $125,000?

"A Yes.

"Q What do you end up as being your loss which you think you ought to be paid for? Do you understand my question?

"A No.

"Q. You had $125,000 and you deducted $100,000 you were told you couldn't be paid for?

"A. Yes.

"Q. What is the difference?

"A. $25,000.00."

The owner's attorney in his opening statement acknowledged that no compensation could be paid for loss of access. He stated:

"This place had for many years enjoyed a large amount of Indian trading business, in addition to the regular tourist travel that goes up and down Highway 66, which is substantial. * * * But it was a real prosperous business, lucrative business. * * * At the end of the sings, possibly two days, and they usually ended them on a Friday or Saturday, they would then buy their groceries and the various items they wanted to take back home.

* * *

"This * * * is one of those case which I like to term in my own mind as 'legal murder on the highway'."

Under all the circumstances it is our opinion that the quoted portion of the instruction was a proper instruction to limit the areas of consideration of the income and loss of income and to restrict that use to the determination of fair market value.

We quote from the owners opening brief on appeal:

"As we have heretofore noted, no instruction was given which fairly pointed out to the jury that the jury could find that defendants were greatly damaged, and *compensably*, due to their *complete inability to use* one remaining parcel of their property. * * *"

It is urged that this failure was fundamental error requiring a reversal, even in the absence of an adequate record in the trial court, asserting that the owners were deprived of their constitutional rights. We have read the instructions in their entirety and find an absence of fundamental error.

We are of the opinion that the doctrine of fundamental error, at least insofar as it is applied to civil cases, should be used sparingly. The overall thrust of the instructions advised the jury that it must return a verdict in favor of the owners for severance damages. The instructions closed with a reading of the form of verdict relating to severance damages immediately following which the court stated:

"* * * [A]nd again you will fill in that amount."

The owners were ably represented in the trial court by counsel not of record on the appeal. His examinations and cross-examinations were able and searching. The argument to the jury was not reported but within the framework of the instructions he was no way limited in urging the position of his clients to the fullest extent.

The judgment is affirmed.

CAMERON, C. J., and DONOFRIO, J., concur.