513 P.2d 145

**HOME INDEMNITY COMPANY, a corporation, Appellant,**

v.

**Walter BUSH, Appellee.**

**No. 1 CA–CIV. 1826.**

Court of Appeals of Arizona,
Division 1,
Department A.

Aug. 21, 1973.

Rehearing Denied Oct. 30, 1973.

Burch, Cracchiolo, Levie, Guyer & Weyl by Michael E. Bradford, and Joseph L. Moore, Phoenix, for appellant.

Fennemore, Craig, von Ammon & Udall by Silas H. Shultz and Michael Preston Green, Phoenix, for appellee.

DONOFRIO, Presiding Judge.

This is an appeal from a judgment on a jury verdict of $10,008 in favor of plaintiff-insured Walter Bush (Bush), and against defendant-insurer Home Indemnity Corporation (Home), and from an order denying a motion for a new trial.

On an appeal reviewing the judgment and order denying a motion for new trial, this Court will consider all conflicting evidence in the light most favorable to the appellee and will take as true all competent evidence supporting the judgment. Hibbitts v. Walter Jacoby & Sons, 9 Ariz. App. 486, 453 P.2d 997 (1969). Examining the record in this light, we find the following fact situation.

Home issued Bush a general automobile liability policy for the period January 11, 1969 through January 11, 1970 on a 1969

Ford pickup truck and camper. The pickup had many options and features on it which added to its overall value. The insured at the time of the accident was an avid sportsman, hunter and guide. He used the vehicle to get to the "back country" on his many hunting excursions. It was on one such hunting trip that the accident took place.

On or about August 10, 1969 Bush, together with a companion, were in the subject vehicle, and while traveling at about 70 miles per hour collided with a bridge abutment, resulting in serious injury to both of them, and extensive damage to the vehicle. The vehicle had approximately 3000 miles on it at that time. It is uncontroverted that the policy was in effect and the vehicle properly insured at the time of the accident.

The day after the accident Bush submitted a collision damage claim to his insurance agent who in turn turned it over to one of Home's adjusters, Orville Howard (Howard). Howard testified at trial that this claim was the customary means of providing notice of loss.

The policy provided Home with the option of either replacing or repairing the vehicle, and further provided Home with the authorization to make a cash settlement. Home, through its representative Howard, elected to repair the pickup. By electing to repair, Home assumed the obligation, under the terms of the policy, of putting the pickup in substantially the same condition as it was prior to the accident. Bush initially expressed grave doubts that the vehicle could be properly restored to such condition and operated safely, especially in light of the extensive damage resulting from the crash. After having the options explained to him Bush reluctantly signed a repair order, authorizing Berge Ford (Berge) to do the repairs. A letter was submitted from Bush to Berge and attached to the repair work order, setting forth certain requirements regarding the repair of the vehicle. The contents of the letter were made known to Howard and apparently no opposition to the conditions therein was ever expressed by Home.

In September 1969 Berge began the repairs to the vehicle. The workman who was given the assignment of rebuilding the pickup was relatively inexperienced in that work area and was dismissed shortly after he was given his assignment for doing generally "lousy" repair work.

In December 1969, approximately four months after the accident, Berge notified Bush that the repairs were completed and that the vehicle was ready. After inspecting it, however, Bush found that the repairs did not adequately conform to the agreed upon conditions. He felt that the vehicle was unsafe in its then existing condition and therefore refused to accept it. He also refused to sign a "proof of loss" statement, which appears from the evidence to be a kind of release.

Substantial evidence was presented at trial to support Bush's contention that the truck had not been properly repaired. No inspection of the vehicle in the form of a road test or otherwise was ever performed. From the time of Bush's initial rejection of the vehicle in December 1969 to the time of trial in April 1971—a period of some sixteen months—Berge maintained exclusive possession of the vehicle and could have made necessary repairs. Nevertheless, at the time the jury viewed the pickup it "dogtracked." A "dogtracking" vehicle is one wherein the frame is not set straight. Although Home insisted that the pickup had been properly repaired more than a year prior to trial, additional repairs were apparently attempted or accomplished during the trial and just prior to the viewing of it by the jury. From the transcript of record it appears that those repairs were directed at the defects Bush had pointed out while testifying. In any event, as above stated, the truck still "dogtracked" when tested and viewed by the jury.

Home, as appellant, raises the following questions for review:

1) Whether the trial court committed error in failing to grant Home's motion for a directed verdict based upon an appraisal and arbitration clause in the insurance contract;

2) Whether it was error for the trial court to have instructed the jury concerning damages for loss of use;

3) Whether the trial court erred in refusing defendant's requested instruction concerning the applicable measure of damages;

4) Whether the trial court committed error in refusing to give Home's Instruction No. 4, which stated in effect that if the jury found that the insured unreasonably refused to honor the carrier's election under the insurance contract to repair the vehicle in question, they should find for the defendant; and

5) Whether the trial court erred in stating to the jury in an instruction that Home elected to repair the vehicle.

## DID THE TRIAL COURT COMMIT ERROR IN DENYING DEFENDANT'S MOTION FOR DIRECTED VERDICT?

Home initially contends that the trial court erred in failing to grant its motion for a directed verdict based upon an appraisal and arbitration clause in the policy. Said clause provides in pertinent part as follows:

"If the named insured and the company fail to agree as to the *amount of loss*, either may, within 60 days after proof of loss is filed, demand an appraisal of the loss. In such event the named insured and the company shall each select a competent appraiser, and the appraisers shall select a competent and disinterested umpire. The appraisers shall state separately the actual cash value and the amount of loss and failing to agree shall submit their differences to the umpire. An award in writing of any two shall determine the *amount of loss*. . . . ." (emphasis added)

Home argues the clause's applicability, asserting that Bush failed to comply with the policy provisions in failing to demand an appraisal of his loss prior to the time he filed suit. In disposing of this contention we cite with approval the following general propositions which are found in 46 C.J. S. Insurance § 1195(d)(2), at pp. 132–133:

"Election to Restore or Repair

"After the insurer's election to repair or rebuild, the rights of the parties are governed by the agreement to repair or rebuild, which must be carried out within a reasonable time and in a workmanlike manner; and for failure to repair or rebuild in the proper time and manner the insurer is liable in accordance with the general rules governing such agreements.

"It has generally been considered that, if insurer elects to repair, replace, or rebuild, the policy becomes in effect a new and independent contract to replace the property or restore it to its former condition, and that insurer's liability thereafter is for breach of the contract to repair, replace, or rebuild, and not under the obligation to pay the insurance.

. . .

"Unless the facts were unknown to insurer at the time, the election operates as a waiver of defenses to the policy which are inconsistent therewith, and also waives the conditions of the policy as to the manner of arbitrating or otherwise ascertaining the amount of the loss."

We agree with Bush that the appraisal and arbitration provision is relevant at the time the insurer and insured are determining the actual amount of the loss, and if they fail to reach some agreement as to the amount of loss they may submit the issue to arbitration. Where a policy contains a provision allowing the insurer the option to repair, replace or rebuild the damaged item and the option is exercised, the rights and duties of the parties become governed by the new agreement under the policy. Thereupon, any provisions dealing

with appraisal or arbitration are specifically waived. Failure to properly repair, replace or rebuild within a reasonable time and in a proper manner will then subject the insurer to liability in accordance with the general rules of contract law. 46 C.J.S. Insurance § 1195(d)(2), *supra*.

From the evidence presented in this case, it appears that there was no legitimate dispute as to amount of loss, but rather that the dispute centered over the *quality* of the repairs, and whether the vehicle had been repaired to a condition substantially commensurate with its condition immediately prior to the accident.

Based upon the above, we find that the trial court correctly denied defendant's motion for a directed verdict.

## WAS IT ERROR FOR THE TRIAL COURT TO HAVE INSTRUCTED THE JURY ON LOSS OF USE AS A MEASURE OF DAMAGES?

At the conclusion of trial, the court instructed the jury that if they found for the plaintiff they could award him damages for loss of use of the vehicle. Home made proper objection to the giving of this instruction. It would appear that the jury's verdict of slightly more than $10,000 apparently stems from the jury's awarding of damages for matters other than the diminution in value of the pickup.

On appeal Home argues, in the alternative, first that special damages must be specially pleaded, Mandelbaum v. Knutson, 11 Ariz.App. 148, 462 P.2d 841 (1970), and failure to make a specific allegation will bar recovery where special damages are mentioned only in the prayer for relief, as was the situation in the case at bar. *See* Rule 9(g), Arizona Rules of Civil Procedure, 16 A.R.S. Secondly, Home argues that even if Bush's complaint was not fatally defective for failing to specially plead damages for loss of use, Arizona law would still preclude Bush from receiving any damages for loss of use.

Notwithstanding the general rule that special damages must be specially pleaded in a case, they may nevertheless be awarded where evidence is admitted, without objection, on the issue of special damages during trial. Gilmore v. Cohen, 95 Ariz. 34, 386 P.2d 81 (1963). Moreover, Rule 15(b), Arizona Rules of Civil Procedure, 16 A.R.S., specifically provides:

*"When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings . . . ."* (emphasis added)

The obvious effect of Rule 15(b) in the instant case is to treat the issues relating to loss of use as though they had been actually pleaded in the complaint.

In order to raise this type of issue on appeal a timely objection, to the effect that the matters are outside the pleadings, must be made at the time the evidence or testimony is offered or heard. While appellant states that its counsel by stipulation reserved objection to the admission of evidence on loss of use, we are not directed to any reference in the record to substantiate that claim. Appellee denies that there was such a stipulation. Indeed, in our independent review of the record, we do not find any such stipulation. On the contrary, when Home objected to the giving of the loss of use instruction, it made no reference to Bush's failure to specially plead loss of use damages.

Under the circumstances of the instant case, we find the tenets of Rule 15(b) and Gilmore v. Cohen, *supra*, controlling and that instructions on the special damages for loss of use could properly be given, even though not specifically pleaded, because Home's failure to timely object to evidence submitted on that issue amounted to a trial of the issue by implied consent.

Home bases its second argument, i. e., that Bush is nevertheless not entitled to recover damages for loss of use, on the recent decision of the Court of Appeals in Cagle v. Home Ins. Co., 14 Ariz.App. 360, 483 P.2d 592 (1971), wherein Department B of this Court affirmed the granting of

summary judgment in favor of the insurer where the policy failed to provide for the insurer's indemnification of the insured for loss of use. As hereinafter explained, Cagle is readily distinguishable from the instant case, however. In Cagle the plaintiff-carrier had insured cargo carried in its trucks, including a tractor and backhoe owned by a third-party contractor. The tractor and backhoe were totally destroyed while being transported by the carrier. The insurer paid for the loss of the tractor and backhoe, but not for the contractor's loss of use of the equipment. This latter action was subsequently upheld by the courts.

The issue in Cagle, succinctly stated, was " . . . whether the insurance contract did, in fact, include coverage for the loss of services of the tractor and backhoe." 14 Ariz.App. at 361, 483 P.2d at 593. The issue there is markedly different from the issue here, namely, whether the insurer failed to properly repair a damaged vehicle as contracted to do.

Cagle did not deal with collision coverage in a general automobile policy, but rather with the liability or indemnification portions of a motor carrier's liability policy with the so-called "Arizona Rider." The damage in Cagle was sustained by someone other than the named insured, and the question was whether the policy of insurance would indemnify the named insured against a judgment obtained against him for loss of use. The insurer there played no part in the creation of the injured party's loss of use.

■ In the case *sub judice,* the concern is not with the insurer's duty to indemnify an award for the damages which are insured may owe another person arising out of tort. The concern here is with the failure of the insurer to perform a duty it allegedly owes to its insured arising out of contract. The policy in question does not provide for the eventuality of a failure to properly perform this duty. In light of what has previously been stated in this opinion, we find that the general law relating to damages for breach of contract controls in this case.

■ Generally, damages for breach of contract are those proximately caused by the breach, or which are within the contemplation of the parties at the time they entered into the contract. Reliable Electric Co. v. Clinton Campbell Contractor, Inc., 10 Ariz.App. 371, 459 P.2d 98 (1969); Thornton v. Marsico, 5 Ariz.App. 299, 425 P.2d 869 (1967).

The subject insurance contract does not contain a provision for liquidated damages, nor a limitation of damages in the event of the insurer's breach of the contract. The only provision in the policy dealing with the insurer's liability concerns the options available to it (which have previously been discussed) at the time of the loss. Because that provision becomes inapplicable after the election is made, it cannot operate to limit the insurer's liability in the event of its failure to carry through on its election.

There are no previous Arizona cases dealing with the measure of damages in cases involving breach of contract on facts similar to this case. In reviewing case authority from other jurisdictions we find that the general rules concerning damages for breach of contract previously stated are applicable here, and that damages for loss of use may be awarded for such breach. In Owens v. Pyeatt, 248 Cal.App. 2d 840, 57 Cal.Rptr. 100 (1967), the California Court of Appeals held that the failure of an automobile insurer to return the insured's vehicle to the insured, properly repaired and within a reasonable time, would support an award of damages for the loss of use to the insured. The policy involved in Owens contained provisions remarkably similar to the provision in the policy in the case at bar.

In Owens, as here, the insured refused to accept his vehicle on the grounds that the repairs were incomplete, and the insurer would not permit him to take possession unless he signed a release similar in import to a "proof of loss" here. In holding that the breach of the obligation to make prop-

er repairs within a reasonable time supported an award for loss of use, the Court noted:

" . . . a finding the insurance contract was breached by failure to pay for or make repairs within a reasonable time would support an award of damages for loss of use of the automobile. Where, under a policy of insurance similar to that in the case at bench, the insurer elects to repair the damaged automobile of the insured the latter may recover damages for any loss of use of the automobile proximately caused by the failure to repair it within a reasonable time. . . . The damages for loss of use of an automobile are measured by the reasonable rental value thereof for the time of the loss. . . . " Owens v. Pyeatt, 57 Cal.Rptr. at pp. 106–107.

It is to be noted that the parties stipulated at trial that a reasonable rental value would have been $12.00 per day and six cents per mile. Bush testified that he could reasonably estimate the number of days he was deprived of the use of his vehicle for his hunting expeditions to be slightly over 200 days, and that the total mileage for these trips would be approximately 10,000 miles.

In Coleman v. American Bankers Insurance Co. of Fla., 228 So.2d 410 (Fla.App. 1969), the Florida Supreme Court upheld the trial court's refusal to give the following instruction:

" . . . then you may find as an element of damages that the plaintiff is entitled to the loss of use of plaintiff's automobile for the time plaintiff was deprived of possession of said automobile."

The Court went on to explain:

"However, it does appear that the insurance company should be liable for damages for loss of use for any *unreasonable delay* in making the repairs it elected to do." (emphasis added) 228 So.2d at 412.

The instruction in the instant case made provision for awarding damages for loss of use *only if* the jury found the delay in repairing the vehicle to be *unreasonable*. We agree with the reasoning in the California and Florida cases, supra, and find that the instruction in this case, in light of the above, could properly be given.

## DID THE TRIAL COURT ERR IN REFUSING TO GIVE HOME'S REQUESTED INSTRUCTION OF THE APPLICABLE MEASURE OF DAMAGES?

█ This question is somewhat of a rehash of the previous question and revolves around an instruction which addressed itself specifically to the question of whether Bush's vehicle was repairable. The issue before the jury was not whether the pickup was repairable, however. It was a foregone conclusion that Home elected to repair the vehicle and Bush concurred. The disputed issue, once again, was over the *quality* of the repairs. It should further be noted that the instruction does not take into account a possible finding that the insurance contract was breached by a failure to make proper repairs within a reasonable time, thus supporting an award for damages for loss of use. Thus, Home's requested instruction was really not relevant to the issue presented and was properly refused by the trial court.

## WAS IT ERROR FOR THE TRIAL COURT NOT TO GIVE HOME'S INSTRUCTION NUMBER 4?

█ Defendant insurer's requested instruction stated as follows:

"You are instructed that under the policy of insurance that is in evidence as Exhibit ___, the insurance company (Defendant) has the option to replace the vehicle or to repair it.

"If you find that the insured (Plaintiff) has unreasonably refused to honor such election or has defeated such election, you should find for the Defendant."

Home claims that this instruction was based upon evidence that Bush could have

entered into an agreement with Berge, not Home; that Bush never intended to accept the pickup; and that Bush's purpose was to defeat Home's election to repair the truck. Nothing in the record is presented, however, to support the contention. On the contrary, the record is replete with evidence showing that the agreement to repair was between Home and Bush, and further indicating that the vehicle was not properly repaired and that Bush's refusal was not unreasonable under the circumstances. He waited approximately four months for the repairs to be completed. Upon inspection, he found the vehicle unsatisfactory. There was also evidence presented that some sixteen months after the repairs had been completed, additional repairs were still being made, and that the vehicle nevertheless "dogtracked" at the time of the jury view. The evidence therefore presents a substantial basis for the trial court's ruling, refusing Home's requested instruction Number 4.

## WAS IT ERROR FOR THE TRIAL COURT TO HAVE STATED THAT HOME ELECTED TO REPAIR THE VEHICLE?

The transcript reveals that the jury returned from its deliberation at one point to request the court to reread some of the instructions. The court read the following:

" . . . So I'm not going to bother to explain to you again the contract, except to repeat that by the contract the defendant was given the option to repair that vehicle if he elected to do so and *under the evidence it did elect to repair the truck.*" (emphasis added)

■ Home argues that the foregoing instruction as reread was a comment on the evidence, was never presented to counsel in chambers, and that counsel for Home was never given an opportunity to object. Earlier at the trial, however, the court, in reading the instructions pertinent to the case, read the following:

"The policy gave the defendant insurance company certain options, one of which was to repair or replace the damaged property, *and in this case the evidence has indicated that the insurance company elected to have this truck repaired.*" (emphasis added)

The instruction with which Home takes issue is obviously but a slight rephrasing of the earlier instruction. Counsel for both parties were given the opportunity to object to the earlier instruction, but did not do so, and while Home contends it objected to it, the record does not bear this out. Further, Home failed to contend or even suggest in its motion for a new trial that the giving of the instruction constituted error. Thus, this objection is raised for the first time on appeal, and is thereby waived. Rule 51(a), Rules of Civil Procedure, 16 A.R.S.; Snethen v. Gomez, 6 Ariz.App. 366, 432 P.2d 914 (1967); Whitly v. Moore, 5 Ariz.App. 369, 427 P.2d 350 (1967).

■ The only question remaining is whether the emphasized portion of the reread instruction constitutes "fundamental and reversible error in that it deprived appellant of a constitutional right." Trojanovich v. Marshall, 95 Ariz. 145, 146, 388 P.2d 149, 150 (1963).

In our recent decision in Moser v. Mardian Construction Co., 20 Ariz.App. 27, 509 P.2d 1064 (1973), we said:

" . . . [t]he doctrine of fundamental error in civil cases should be sparingly applied. Ortega v. State, 6 Ariz.App. 356, 432 P.2d 904 (1967), and possibly limited to those cases where the instruction deprives either party of a constitutional right. The instructions complained of here are neither subject to the constitutional infirmities noted in Layton v. Rocha, 90 Ariz. 369, 368 P.2d 444 (1962), nor in our opinion do they undercut the very foundation of the [parties'] causes of action. *See,* Wagner v. Coronet Hotel, 10 Ariz.App. 296, 458 P. 2d 390 (1969). . . ."

509 P.2d at 1067.

Under the circumstances of the case at bar, a "comment" on the well-established

fact that the insurer elected to repair the vehicle in question did not constitute fundamental error.

In viewing the instructions given at trial as a whole, we find that they correctly and adequately apprised the jury of the circumstances of the case. We have examined the record and find reasonable evidence to support the jury's verdict in this case and we therefore affirm the trial court's judgment.

OGG and STEVENS, JJ., concur.