411 S.E.2d 850

**Carl W. SMITHSON, Sr., dba Smithson Bros. Well Service Co., Plaintiff Below, Appellee,**

v.

**UNITED STATES FIDELITY & GUARANTY COMPANY, and Basil Thumm, Defendants Below, Appellants.**

No. 20073.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 24, 1991.

Decided Nov. 22, 1991.

198

Thomas C. Cady, Morgantown, for appellee.

John E. Busch, Busch & Talbott, L.C., Elkins, for appellants.

MILLER, Chief Justice:

United States Fidelity & Guaranty Company (USF & G) appeals an adverse jury verdict in which its insured, Carl W. Smithson, Sr., doing business as Smithson Brothers Well Service Company, recovered $95,833 in a first-party bad faith settlement practices suit. USF & G argues that the trial court erred in failing to disqualify plaintiff's attorney and in not finding that the appraisal procedure under the policy barred the present suit. Several other errors relate to the damage award. We find that the plaintiff failed to present sufficient evidence of economic loss to support the verdict.

I.

USF & G insured a truck with a drilling rig attachment that was owned by the partnership of Carl Smithson and his brother, Danny Smithson. The policy limit was $60,000. On September 16, 1985, the truck was destroyed in a gas well explosion. The insured made a claim for the value of the equipment together with tools. After the insured submitted his proof of loss form, the two parties could not agree on the actual cash value of the property. Consequently, on January 15, 1986, USF & G invoked the appraisal procedure provided for in the policy.[1]

On February 11, 1986, Carl Smithson retained an attorney, who initially refused to agree to submit the claim to appraisal; however, two months later, the attorney changed his mind and selected an appraiser to represent the plaintiff on May 8, 1986. Smithson's appraiser and USF & G's appraiser could not agree on the value of the property damaged.

Under the policy appraisal procedure, the two appraisers are required to select an umpire. The parties could not agree on an umpire. Eventually, the matter was referred to the American Arbitration Association (AAA), which designated an umpire. On April 18, 1988, the umpire estimated the loss at approximately $67,000. Because the actual cash value of the insured's property exceeded the policy limit, USF & G paid the insured $60,000.

Subsequently, on June 14, 1988, Mr. Smithson sued USF & G, alleging that the insurer acted in bad faith by failing to settle his claim promptly. At trial, the circuit court directed a verdict for Mr. Smithson on the issue of liability because

1. The appraisal provision states:

"Appraisal. If the Insured and the Company fail to agree as to the amount of loss, each shall on the written demand of either, made within sixty days after receipt of proof of loss by the Company, select a competent and disinterested appraiser, and the appraisal shall be made at a reasonable time and place. The appraisers shall first select a competent and disinterested umpire, and failing for fifteen days to agree upon such umpire, then, on the request of the Insured or the Company, such umpire shall be selected by a judge of a court of record in the State in which such appraisal is pending. The appraisers shall then appraise the loss, stating separately the actual cash value at the time of loss and the amount of loss, and failing to agree shall submit their differences to the umpire. An award in writing of any two shall determine the amount of loss. The Insured and the Company shall each pay his or its chosen appraiser and shall bear equally the other expenses of the appraisal and umpire. The Company shall not be held to have waived any of its rights by any act relating to appraisal."

he had substantially prevailed in the underlying appraisal proceeding.[2] *See* Syllabus Point 1, *Hayseeds, Inc. v. State Farm Fire & Casualty Co.*, 177 W.Va. 323, 352 S.E.2d 73 (1986). The only issue submitted to the jury was the amount of consequential damages the plaintiff could recover, which included net economic losses, aggravation, and inconvenience.[3] The jury rendered a verdict of $95,833, and the trial court awarded the plaintiff attorney's fees equal to one-third of this amount.

## II.

■ The first issue raised by USF & G is the trial court's failure to disqualify Mr. Smithson's attorney when USF & G informed the court that it desired to call him as a witness. USF & G contends that Mr. Smithson's attorney unduly prolonged the appraisal process, thereby increasing the plaintiff's economic losses. In support of its argument, USF & G cites DR 5–102 under Canon 5 of the Code of Professional Responsibility.[4] A similar prohibition is found in Rule 3.7 of the current Rules of Professional Conduct.[5] Both of these rules state that it is unethical for a lawyer representing a client to appear as a witness on behalf of the client except under very limited conditions. Here, USF & G proposed to call the plaintiff's attorney and question him on matters that were adverse to his client's interests. In this situation, courts have recognized the potential for abuse and and have been reluctant to disqualify the attorney without a showing of compelling circumstances.

The Arizona Supreme Court analyzed this issue in *Cottonwood Estates, Inc. v. Paradise Builders, Inc.*, 128 Ariz. 99, 624 P.2d 296 (1981). The trial court *sua sponte* disqualified the plaintiff's attorney upon learning that the defendant planned to call him as a witness. The Supreme Court of Arizona began by recognizing the general rule that where counsel representing a party discerns that he will be a witness for such party, the attorney should ordinarily withdraw from representation. In analyzing this issue, the Arizona court cited our case of *Edmiston v. Wilson*, 146 W.Va. 511, 120 S.E.2d 491 (1961), where we stated in Syllabus Points 7 and 8:

> "7. Any practice which enables an attorney, while engaged in the prosecution or the defense of litigation, to testify as a witness in the course of such litigation is disapproved.

> "8. When counsel for a party to a cause finds that he is required to be a material witness for his client he should

2. The highest offer made by USF & G before the appraisal procedure was invoked was $25,000.

3. The trial court refused to instruct the jury on punitive damages.

4. At the time of this litigation, DR 5–102 of the Code of Professional Responsibility, was in effect:

> "**Withdrawal as Counsel When the Lawyer Becomes a Witness.**—(A) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5–101(B)(1) through (4).
> "(B) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm may be called as a witness other than on behalf of his client, he may continue the

representation until it is apparent that his testimony is or may be prejudicial to his client."

5. On June 30, 1988, this Court adopted the Rules of Professional Conduct, which became effective on January 1, 1989. These rules superseded the Code of Professional Responsibility. The current counterpart of DR 5–102 is Rule 3.7 of the Rules of Professional Conduct, which provides:

> "(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:
> "(1) the testimony relates to an uncontested issue;
> "(2) the testimony relates to the nature and value of legal services rendered in the case; or
> "(3) disqualification of the lawyer would work substantial hardship on the client.
> "(b) A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9."

immediately so advise his client and retire as counsel in the case."

In *Edmiston,* we decided the case without reference to the canons of legal ethics and instead relied on cases from other jurisdictions where general dissatisfaction had been expressed concerning this practice.[6] The rationale for such a rule is explained in Ethical Consideration 5–9 under Canon 5 of the Code of Professional Responsibility:

"Occasionally a lawyer is called upon to decide in a particular case whether he will be a witness or an advocate. If a lawyer is both counsel and witness, he becomes more easily impeachable for interest and thus may be a less effective witness. Conversely, the opposing counsel may be handicapped in challenging the credibility of the lawyer when the lawyer also appears as an advocate in the case. An advocate who becomes a witness is in the unseemly and ineffective position of arguing his own credibility. The roles of an advocate and of a witness are inconsistent; the function of an advocate is to advance or argue the cause of another, while that of a witness is to state facts objectively."

DR 5–102(A) does recognize a few exceptions in which a lawyer may still represent a client and testify on his behalf. These exceptions are delineated in DR 5–101(B)(1) through (4):

"(1) If the testimony will relate solely to an uncontested matter.

"(2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.

"(3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client.

"(4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the

lawyer or his firm as counsel in the particular case."

Courts have recognized these exceptions. *See, e.g., J.P. Foley & Co. v. Vanderbilt,* 523 F.2d 1357 (2d Cir.1975); *Cottonwood Estates, Inc. v. Paradise Builders, Inc., supra; Branom v. Smith Frozen Foods of Idaho, Inc.,* 83 Idaho 502, 365 P.2d 958 (1961); *Robbins v. Hannen,* 194 Kan. 596, 400 P.2d 733 (1965).

In *Cottonwood Estates,* the court stated that DR 5–102(B) does not automatically disqualify a lawyer if he is "called as a witness other than on behalf of his client[.]" 128 Ariz. at 104, 624 P.2d at 301. Rather, the lawyer "may continue the representation until it is apparent his testimony is or may be prejudicial to his client." 128 Ariz. at 104, 624 P.2d at 301. However, the court further recognized the potential for abuse where a party moves to disqualify opposing counsel on the ground that he may be called as a potential witness:

"DR 5–102(B) works ... to prevent opposing counsel from contriving some tactical need for calling the attorney thereby triggering disqualification. *See Smith v. Arc–Mation,* [402 Mich. 115, 261 N.W.2d 713 (1978)]. To call for the disqualification of opposing counsel for delay or other tactical reasons, in the absence of prejudice to either side, is a practice which will not be tolerated. *Phillips v. Liberty Mutual Insurance Co.,* 43 Del.Ch. 436, 235 A.2d 835 (1967); *Galarowicz v. Ward,* 119 Utah 611, 230 P.2d 576 (1951).

"By misusing the advocate-witness prohibition, an attorney might elbow opposing counsel out of the litigation for tactical reasons. *International Electronics Corp. v. Flanzer,* 527 F.2d 1288 (2d Cir.1975); *J.P. Foley & Co. v. Vanderbilt,* 523 F.2d [1357] at 1360 (Guerin,

---

**6.** This Court first adopted a Code of Professional Ethics for Lawyers in 1947. *See* 128 W.Va. Reports xvii (1947). Rule 19 of that Code stated:

"When a lawyer is a witness for his client, except as to merely formal matters, such as

the attestation or custody of an instrument and the like, he should leave the trial of the case to other counsel. Except when essential to the ends of justice, a lawyer should avoid testifying in court in behalf of his client."

J. conc.)." 128 Ariz. at 104–05, 624 P.2d at 301–02.

■ Because of these concerns, the court in *Cottonwood Estates* formulated this rule with regard to motions to disqualify opposing counsel:

"When an attorney is to be called other than on behalf of his client, a motion for disqualification must be supported by a showing that the attorney will give evidence material to the determination of the issues being litigated, that the evidence is unobtainable elsewhere, and that the testimony is or may be prejudicial to the testifying attorney's client." 128 Ariz. at 105, 624 P.2d at 302. [7]

Other courts have adopted a similar rule. *See, e.g., Davis v. Stamler*, 494 F.Supp. 339 (D.N.J.1980), *aff'd*, 650 F.2d 477 (3d Cir. 1981); *Cazares v. Church of Scientology of Cal., Inc.*, 429 So.2d 348 (Fla.App.), *review denied*, 438 So.2d 831 (1983); *Serody v. Serody*, 19 Mass.App. 411, 474 N.E.2d 1171 (1985). We agree with the foregoing analysis because it strikes a reasonable balance between the potential for abuse and those instances where the attorney's testimony may be truly necessary to the opposing party's case.

Consequently, we conclude that when an attorney is sought to be disqualified from representing his client because an opposing party desires to call the attorney as a witness, the motion for disqualification should not be granted unless the following factors can be met: First, it must be shown that the attorney will give evidence material to the determination of the issues being litigated; second, the evidence cannot be obtained elsewhere; and, third, the testimony is prejudicial or may be potentially prejudicial to the testifying attorney's client.

■ In this case, USF & G's motion to disqualify stated that the plaintiff's attorney would be called as a witness because part of the delay in settling the claim was the plaintiff's attorney's fault. USF & G represented that the attorney had already conceded this point in his deposition. However, USF & G failed to show that the desired testimony could not have been developed by other witnesses. Indeed, it seems likely that the USF & G employee who adjusted the fire loss and participated in the appraisal process could have testified about the delay allegedly caused by the plaintiff's attorney. Moreover, USF & G's attorney who oversaw the appraisal process was not associated with the law firm that ultimately defended the insurer in the bad faith suit. USF & G made no showing that its first attorney was unavailable to testify about the delay. Accordingly, we find the disqualification issue without merit.

### III.

USF & G next asserts that the plaintiff's bad faith suit was barred because the underlying fire loss was settled through arbitration. USF & G cites several cases in which we held that where a contract provides for mandatory arbitration, it precludes the parties from litigating the controversy in the courts. Our most comprehensive case on this subject is *Board of Education v. W. Harley Miller, Inc.*, 160 W.Va. 473, 236 S.E.2d 439 (1977), where we set out this general rule in Syllabus Point 1:

"Where parties to a contract agree to arbitrate either all disputes, or particular limited disputes arising under the contract, and where the parties bargained for the arbitration provision, such provision is binding, and specifically enforceable, and all causes of action arising under the contract which by the contract terms are made arbitrable are merged, in the absence of fraud, into the award of the arbitrators."

However, we further acknowledged that a contractual requirement of arbitration is

---

7. Courts have also indicated that disqualification motions should be viewed cautiously because, if granted, the client would be deprived of his chosen counsel. *See, e.g., W.T. Grant Co. v. Haines*, 531 F.2d 671 (2d Cir.1976); *Security Gen. Life Ins. Co. v. Superior Court*, 149 Ariz. 332, 718 P.2d 985 (1986) (en banc); *Comden v. Superior Court*, 20 Cal.3d 906, 145 Cal.Rptr. 9, 576 P.2d 971, *cert. denied*, 439 U.S. 981, 99 S.Ct. 568, 58 L.Ed.2d 652 (1978); *Borman v. Borman*, 378 Mass. 775, 393 N.E.2d 847 (1979).

not absolute and will not be enforced if there was disparate bargaining power, if there was an adhesion contract, or if the provision was unconscionable.[8]

■ The initial fallacy in USF & G's argument is that the insurance contract did not provide for arbitration, but rather for an appraisal of the loss. Under an ordinary appraisal clause, the only issue is the amount of the loss. Questions concerning policy defenses or coverage are not addressed in appraisals. The narrow purpose of an appraisal and the lack of an evidentiary hearing make it a much different procedure from arbitration. *See Hartford Lloyd's Ins. Co. v. Teachworth*, 898 F.2d 1058 (5th Cir.1990); *Southeast Nursing Home, Inc. v. St. Paul Fire & Marine Ins. Co.*, 750 F.2d 1531 (11th Cir.1985); *Ice City, Inc. v. Insurance Co. of N. Am.*, 456 Pa. 210, 314 A.2d 236 (1974). *See generally* 44 Am.Jur.2d *Insurance* § 1680 (1982 & Supp.1991).

■ Although the parties ultimately agreed to have the umpire appointed by the AAA, the appraisal procedure was not then converted into arbitration. Moreover, we are reluctant to apply our arbitration law to an insurance policy appraisal provision that is neither mandatory nor the exclusive remedy for settling casualty losses. *See* Annot., 25 A.L.R.3d 680 (1969 & Supp. 1991).

Finally, if an insurer could utilize the appraisal process to shield itself from the consequences of failing to make a reasonable settlement offer on a fire loss, it would defeat the principles involved in *Hayseeds, Inc. v. State Farm Fire & Casualty Co.*, 177 W.Va. 323, 352 S.E.2d 73 (1986), and its progeny. We stated this general rule in Syllabus Point 1 of *Hayseeds:*

"Whenever a policyholder substantially prevails in a property damage suit against its insurer, the insurer is liable for: (1) the insured's reasonable attorneys' fees in vindicating its claim; (2) the insured's damages for net economic loss caused by the delay in settlement, and [(3)] damages for aggravation and inconvenience."

This case is like any first-party claim where the insured and the insurance company fail to agree about the amount of the loss. For example, in *Thomas v. State Farm Mutual Automobile Insurance Co.*, 181 W.Va. 604, 383 S.E.2d 786 (1989), the insured was involved in an accident and sought payment for the damage to his truck under the collision coverage of his motor vehicle policy. The insured submitted repair estimates totaling approximately $10,000, but because the insurance company's appraiser estimated the loss at only $4,960, the company offered the lower amount. The offer was rejected. When the insured filed suit against his insurer, he recovered $10,168 for the property damage and towing and storage fees.

On appeal, the company contended that it should not be held liable for the additional *Hayseeds* damages for economic loss and attorney's fees because *Hayseeds* applies only to those situations where the insurer refuses to make any settlement offer. We rejected this contention:

"The critical language in *Hayseeds* refers to 'a policyholder [who] substantially prevails in a property damage suit against its insurer.' Syllabus Point 1, in part. In property damage claims, the loss is tangible and the amount of damages is ordinarily readily susceptible to calculation.... Because a property damage claim is fixed and calculable, there is little danger that the insurer will be exposed to excessive damages. This

---

8. Syllabus Point 3 of *Board of Education v. W. Harley Miller, Inc., supra,* provides:

"It is presumed that an arbitration provision in a written contract was bargained for and that arbitration was intended to be the exclusive means of resolving disputes arising under the contract; however, where a party alleges that the arbitration provision was unconscionable or was thrust upon him because he was unwary and taken advantage of, or that the contract was one of adhesion, the question of whether an arbitration provision was bargained for and valid is a matter of law for the court to determine by reference to the entire contract, the nature of the contracting parties, and the nature of the undertakings covered by the contract."

can give rise to the temptation to place as low a value as possible on the claim in the hope that the insured will settle at the low figure rather than fight. Courts have recognized that this type of conduct on the part of the insurer is actionable under a bad faith theory." 181 W.Va. at 607, 383 S.E.2d at 789. (Citations omitted; footnote omitted).

We then outlined when an insured can recover *Hayseeds* damages in Syllabus Point 2 of *Thomas:*

"The question of whether an insured has substantially prevailed against his insurance company on a property damage claim is determined by the status of the negotiations between the insured and the insurer prior to the institution of the lawsuit. Where the insurance company has offered an amount materially below the damage estimates submitted by the insured, and the jury awards the insured an amount approximating the insured's damage estimates, the insured has substantially prevailed."

■ Consequently, under the foregoing principles, we conclude that a first-party suit based on *Hayseeds* will not be barred by the settlement of the loss in an appraisal proceeding under the fire insurance policy if the insured substantially prevailed in the appraisal proceeding over the amount of the loss.

■ As we have earlier noted, the insured substantially prevailed in the appraisal proceeding. The company offered $25,000 before it invoked the appraisal provision. The insured had demanded the policy limit of $60,000. Once the claim was submitted to appraisal, the amount of loss was determined to be $67,000. Clearly, under *Thomas*, the insured has substantially prevailed.

### IV.

■ USF & G further asserts that the trial court erred when it ruled that Donald Haislip, the insurance agent who sold the

policy to Mr. Smithson, was an agent of USF & G. Because he was found to be an agent of the insurer, the trial court held that, under Rule 801(d)(2)(D) of the West Virginia Rules of Evidence, the plaintiff could testify about remarks Mr. Haislip's made to him about the policy.[9] We recognized this rule in Syllabus Point 3 of *Canterbury v. West Virginia Human Rights Commission*, 181 W.Va. 285, 382 S.E.2d 338 (1989):

"A statement is not hearsay if the statement is offered against a party and is a statement by his [or her] agent or servant concerning a matter within the scope of his [or her] agency or employment, made during the existence of the relationship. *W.Va.R.Evid.* 801(d)(2)(D)."

USF & G submitted an affidavit with a motion in limine requesting the trial court to prohibit the plaintiff from repeating the agent's statements. The affidavit stated that Mr. Haislip was not employed by USF & G, but rather by Chamberlaine & Flowers, which was an independent insurance company with multiple lines of insurance from various companies, only one of which was USF & G.

The legislature settled this question when it enacted W.Va.Code, 33–12–23 in 1957: "Any person who shall solicit within this State an application for insurance shall, in any controversy between the insured or his beneficiary and the insurer issuing any policy upon such application, *be regarded as the agent of such insurer and not the agent of the insured.*" (Emphasis added).

In *Knapp v. Independence Life & Accident Insurance Co.*, 146 W.Va. 163, 118 S.E.2d 631 (1961), we applied this statute. There, the insured purchased a family medical insurance policy which provided $10,000 coverage. The original policy did not provide coverage for cancer; however, approximately one year later, the company sent the insured a rider providing for can-

---

9. Rule 801(d)(2)(D) of the West Virginia Rules of Evidence provides: "A statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship[.]"

cer benefits without any increase in the premium. Although the company sent its agent a letter explaining that the coverage for cancer treatment was limited to $500, the broker neglected to forward this information to the insured. When the insured's wife developed cancer and incurred medical expenses of $2,500, the company refused to pay more than the rider amount of $500. On appeal, the insurer contended that the soliciting broker was not its agent, but rather the insured's. We rejected this point in Syllabus Point 1:

"By virtue of Section 23, Article 12, Chapter 33, Code, 1931, as amended, any person who shall solicit within this State an application for insurance shall, in any controversy between the insured or his beneficiary and the insurer issuing any policy upon such application, be regarded as the agent of the insurer and not the agent of the insured."

In the alternative, the insurance company argued that W.Va.Code, 33–12–13, addressed only those matters involved in procuring the application for insurance. We rejected this assertion as well:

"The position of the defendant is that ... the statute [applies] only to the extent that the application is involved and that the statute does not apply to a controversy in which other questions or issues are in dispute. This position is clearly untenable and can not be given judicial sanction. It is obvious from the clear and unambiguous language of the statute that the solicitor of the application for insurance should be regarded for all purposes as the agent of the insurer in any controversy between it and the

insured or his beneficiary." 146 W.Va. at 169, 118 S.E.2d at 635.

Even though we stated in Syllabus Point 4, in part, of *Maynard v. National Fire Insurance Co. of Hartford*, 147 W.Va. 539, 129 S.E.2d 443 (1963), that "a mere soliciting agent of the insurer ... has [no] authority ... to bind the insurer," *Maynard* did not cite W.Va.Code, 33–12–23, or the *Knapp* case.[10] To the extent it contradicts the statute and *Knapp*, it is overruled. Clearly, under *Knapp* and the statute, Mr. Haislip was an agent of USF & G; therefore, his remarks to Mr. Smithson were admissible under Rule 801(d)(2)(D) of the West Virginia Rules of Evidence.[11]

## V.

■ USF & G next asserts that the trial court erred in allowing the plaintiff to testify that he had been offered $70,000 for the insured property before the fire loss. In other contexts, we have allowed the owner of property, both real and personal, to express an opinion on its value. This was based on the assumption that an owner has some knowledge of his property's worth. *See, e.g., West Virginia Dep't of Highways v. Sickles*, 161 W.Va. 409, 242 S.E.2d 567 (1978), *overruled on other grounds, West Virginia Dep't of Highways v. Brumfield*, 170 W.Va. 677, 295 S.E.2d 917 (1982); *Adkins v. City of Hinton*, 149 W.Va. 613, 142 S.E.2d 889 (1965); *Tennessee Gas Transmission Co. v. Fox*, 134 W.Va. 106, 58 S.E.2d 584 (1950).[12] *Cf. State v. Masters*, 179 W.Va. 752, 373 S.E.2d 173 (1988) (testimony of owner of video store concerning the value of a video cassette recorder is

10. The full text of Syllabus Point 4 of *Maynard* is:

"Neither a mere insurance adjuster as such nor a mere soliciting agent of the insurer as such has authority to admit or deny liability of the insurer on a policy of fire insurance or to bind the insurer by waiver of the provisions of the policy relative to proof of loss or to bind the insurer by estoppel to assert and rely on such policy provisions."

11. The plaintiff contends that Mr. Haislip recommended that he purchase $75,000 coverage for his vehicle, and advised him that, in the

event of a total loss, the policy limits would be paid.

12. Syllabus Point 1 of *Tennessee Gas* states:

"A witness in a proceeding in eminent domain who is acquainted with the land involved, or who has recently visited and examined it and is familiar with the market value of other lands in the same locality, or who owns and has lived upon the land, is sufficiently qualified to give his opinion of its market value. The opinion evidence of a witness so qualified is admissible but its weight and its credibility are questions for the jury."

generally competent to establish the value of property stolen).

It is true, as USF & G asserts, that the remark was couched in terms of an offer the plaintiff received and was technically hearsay.[13] However, admission of this testimony was not reversible error because the value of the vehicle was not a material issue in the case.

## VI.

USF & G's next assignments of error are two theories both arising from the same event. USF & G asserts that the trial court erred in refusing to give its instructions on comparative fault and mitigation of damages. The underlying factual predicate for both of these instructions is that the plaintiff's attorney unduly delayed the appraisal process. We believe this factual predicate is without merit and, therefore, decline to discuss the possible validity of these legal theories.

USF & G invoked the appraisal clause which provided specified procedures.[14] USF & G failed to follow certain steps which would have enabled it to avoid the unreasonable delay.[15] The appraisal language specifically states that "[t]he appraisers shall first select a competent and disinterested umpire[.]"[16] Even though the plaintiff took several months to select an appraiser, the bulk of the delay in settling the claim was due to the appraisers' failure to promptly select the umpire.

The policy language addresses such a dilemma when it states that if after "fifteen days [the appraisers are unable] to agree upon such umpire, then, on the request of the Insured or Company, such umpire shall be selected by a judge of a court of record in the State in which such appraisal is pending." Fifteen days after the plaintiff selected his appraiser, USF & G could have requested the Circuit Court of Gilmer County to appoint an umpire.

Rather than exercise its clear right under the policy, USF & G allowed the matter to drift for approximately eighteen months until the parties finally agreed to have the AAA select an umpire in November of 1987. The actual resolution of the value of the loss did not occur until April of 1988. Courts have applied concepts of waiver and estoppel to insurance appraisal proceedings. *See, e.g., Bard's Apparel Mfg., Inc. v. Bituminous Fire & Marine Ins. Co.*, 849 F.2d 245 (6th Cir.1988); *Southeast Nursing Home, Inc. v. St. Paul Fire & Marine Ins. Co., supra; Kester v. State Farm Fire & Casualty Co.*, 726 F.Supp. 1015 (E.D.Pa.1989); *Home Indem. Co. v. Bush*, 20 Ariz.App. 355, 513 P.2d 145 (1973); *Giulietti v. Connecticut Ins. Placement Facility*, 205 Conn. 424, 534 A.2d 213 (1987); *Weiss v. Insurance Co. of Pa.*, 497 So.2d 285 (Fla.App.1986); *Hanover Fire Ins. Co. v. Drake*, 170 Va. 257, 196 S.E. 664 (1938). *See generally* 44 Am. Jur.2d *Insurance* § 1687. In this case, USF & G, as the party seeking the appraisal, had an affirmative duty to see that the appraisal procedures outlined in the policy were followed.

Moreover, "[a] plaintiff is not under a duty to mitigate damages if the other party, who had the duty to perform under the contract, had equal opportunity to perform and equal knowledge of the consequences of nonperformance." 22 Am.Jur.2d *Damages* § 508 at 591 (1988). (Footnotes omit-

---

**13.** In Syllabus Point 2 of *State v. Boswell*, 107 W.Va. 213, 148 S.E. 1 (1929), we recognized, without discussing the hearsay implications, that testimony about a bona fide offer to purchase an item was admissible to prove the item's market value.

**14.** For the full text of the appraisal provision, see note 1, *supra.*

**15.** We assume for purposes of the discussion that USF & G timely invoked the appraisal process by demanding it within sixty days after receiving the insured's proof of loss.

**16.** USF & G's failure to comply with the appraisal is further evidenced by the language in the policy following the provision dealing with how an umpire is selected if the appraisers cannot agree. It is not until an umpire has been selected that "the appraisers shall then appraise the loss[.]" Thus, the first step in the appraisal process is the selection of the appraisers who then select an umpire. *See generally* 44 Am. Jur.2d *Insurance* § 1690 (1982).

ted). The breadth of this rule is more fully discussed in *S.J. Groves & Sons Co. v. Warner Co.*, 576 F.2d 524, 530 (3d Cir. 1978):

"Where both the plaintiff and the defendant have had equal opportunity to reduce the damages by the same act and it is equally reasonable to expect the defendant to minimize damages, the defendant is in no position to contend that the plaintiff failed to mitigate. Nor will the award be reduced on account of damages the defendant could have avoided as easily as the plaintiff. *See* Dobbs, Handbook on the Law of Remedies § 37 at 186 (1973). The duty to mitigate damages is not applicable where the party whose duty it is primarily to perform a contract has equal opportunity for performance and equal knowledge of the consequences of nonperformance. *See Parker v. Harris Pine Mills*, 206 Or. 187, 291 P.2d 709 (1955)."

*Accord SHEA–S & M Ball v. Massman–Kiewit–Early*, 606 F.2d 1245 (D.C.Cir. 1979); *McCarty v. United States*, 185 F.2d 520 (5th Cir.1950); *Unverzagt v. Young Builders, Inc.*, 252 La. 1091, 215 So.2d 823 (1968); *Smith v. Watson*, 406 N.W.2d 685 (N.D.1987); *Ecksel v. Orleans Constr. Co.*, 360 Pa.Super. 119, 519 A.2d 1021 (1987).

■ The foregoing rule seems logical and reasonable. Although it does not appear that we have had occasion to consider this rule, we have held that the burden of proof is on the defendant to show that the plaintiff failed to mitigate his damages. *Paxton v. Crabtree*, 184 W.Va. 237, 400 S.E.2d 245 (1990); *Mason County Bd. of Educ. v. State Superintendent of Schools*, 170 W.Va. 632, 295 S.E.2d 719 (1982); *Martin v. Board of Educ.*, 120 W.Va. 621, 199 S.E. 887 (1938); *Huntington Easy Payment Co. v. Parsons*, 62 W.Va. 26, 57 S.E. 253 (1907). Thus, we conclude that in contract cases, where the defendant has refused to perform and had the same opportunity to mitigate the damages as the plaintiff by taking some action, the defendant is foreclosed from asserting that the plaintiff failed to mitigate his damages. To hold otherwise would allow the wrongdoer to profit from his own wrong.

## VII.

■ USF & G's final contention centers on the plaintiff's lack of evidence to support the $95,000 verdict for economic losses. The only testimony about economic losses incurred was by Danny Smithson, one of the partners in Smithson Brothers Well Service Company. He testified that one month after the fire, the partnership had to finance the purchase of another rig, which resulted in a monthly debt payment of $3,000. The only other evidence about economic losses was a vague estimate made by Danny Smithson that the partnership lost $50,000 in profits before USF & G finally paid the loss. No attempt was made to prove this loss with any detailed evidence from the partnership accounts or its tax returns.

■ The insured cannot recover the amount paid on the principal of the loan. This amount was recovered against USF & G in the appraisal proceeding. A double recovery would result if the partnership could collect under its insurance policy for the destroyed rig and then also recover the purchase price of the new rig from USF & G in a bad faith suit. *See, e.g., Hochman v. American Family Ins. Co.*, 9 Kan. App.2d 151, 673 P.2d 1200 (1984). However, the plaintiff is entitled to prejudgment interest on the $60,000 from the date of the loss until it was paid. *Hardman Trucking, Inc. v. Poling Trucking Co.*, 176 W.Va. 575, 346 S.E.2d 551 (1986).

While *Hayseeds* permits the insured to recover net economic loss caused by an unreasonable delay in settlement of the claim, it does not alter our traditional damage rule, as stated in Syllabus Point 3, *Kentucky Fried Chicken of Morgantown v. Sellaro*, 158 W.Va. 708, 214 S.E.2d 823 (1975):

"Compensatory damages recoverable by an injured party incurred through the breach of a contractual obligation must be proved with reasonable certainty."

*See also Shaeffer v. Burton*, 151 W.Va. 761, 155 S.E.2d 884 (1967); *Steinbrecher v.*

*Jones,* 151 W.Va. 462, 153 S.E.2d 295 (1967).

This case bears some resemblance to *Addair v. Motors Insurance Corp.,* 157 W.Va. 1013, 207 S.E.2d 163 (1974), where the owner of a truck sought to recover damages for loss of use of his vehicle for eighty-three days. Evidence was introduced as to the gross receipts that would have been received each day if the truck had been operating. However, there were no detailed deductions for its operating expenses. We held in Syllabus Point 5 that this proof was insufficient:

> " 'Loss of profits can not be based on estimates which amount to mere speculation and conjecture but must be proved with reasonable certainty.' Point 5, Syllabus, *State ex rel. Shatzer v. Freeport Coal Company,* 144 W.Va. 178 [107 S.E.2d 503 (1959)]."

We conclude that while the plaintiff failed to prove any net economic loss, he can recover attorney's fees incurred during the successful appraisal proceeding. These fees were $15,000. The trial court should also award plaintiff prejudgment interest from the date of the loss until the policy proceeds were paid. In addition, once these amounts are calculated, they will represent the losses authorized by *Hayseeds,* and, as indicated in *Hayseeds,* an additional one-third attorney's fees would be proper in pursuing this first-party claim in the court below.

If the plaintiff desires to accept this amount, a judgment may be entered below. However, if the plaintiff wishes to have a new trial, then the judgment may be set aside and a new trial awarded, as we directed in *Roberts v. Stevens Clinic Hospital, Inc.,* 176 W.Va. 492, 345 S.E.2d 791 (1986).

Reversed and remanded with directions.