432 S.E.2d 774

**Marshall HIGGINBOTHAM, Plaintiff Below, Appellant,**

**v.**

**Hanley C. CLARK, Insurance Commissioner of the State of West Virginia, Defendant Below, Appellee.**

**No. 21417.**

Supreme Court of Appeals of West Virginia.

Submitted May 11, 1993.

Decided June 24, 1993.

Concurring Opinion of Justice Miller July 20, 1993.

Thomas R. Michael, Michael & Kupec, Clarksburg, for appellant.

Linda Gay, Associate Counsel, B. Keith Huffman, Gen. Counsel, Office of Ins. Com'r of W.Va., Charleston, for appellee.

BROTHERTON, Justice:

The appellant, Marshall Higginbotham, appeals from an April 22, 1992, ruling of the Circuit Court of Kanawha County which affirmed the Insurance Commissioner's decision to dismiss the appellant's claim of alleged mine subsidence damage to his home for lack of subject matter jurisdiction. The specific issue now before this Court is whether the Insurance Commissioner has subject matter jurisdiction to review either the West Virginia Board of Risk and Insurance Management's denial of a claim filed under the appellant's homeowner's policy or the insurer's subsequent cancellation of coverage.

Legislation enacted in West Virginia in 1982 provided that mine subsidence insurance coverage would be made available to all state residents through the office of the State Board of Risk and Insurance Management [1] ("Board of Risk"), which serves in an administrative capacity as the Manag-

---

**1.** The Board of Risk is created in W.Va.Code § 29–12–3. Its organization, powers, and duties are explained in W.Va.Code § 29–12–4 and 5.

er and Trustee of the West Virginia Mine Subsidence Fund.[2] In 1983, the appellant renewed his homeowner's insurance policy with State Farm Fire and Casualty Company ("State Farm"), and, as required by W.Va.Code § 33–30–6, State Farm added mine subsidence coverage to the policy.[3] The "coverage" portion of the policy explains that "the dwelling must have sustained the damage after the mine subsidence endorsement was added to the policy. The burden of proof is on the policyholder."

There was no inspection of the home to determine if it had sustained any pre-existing mine subsidence damage. At a hearing on January 26, 1989, the appellant's State Farm agent, Joe Woodward, noted that the mine subsidence coverage was offered "across the board to all policyholders. It would have been physically quite difficult to look at homes to try to determine mine subsidence damage." Thus, State Farm sent the appellant an endorsement which acknowledged his receipt of mine subsidence coverage, and he was charged for the coverage. He paid the premium and the coverage was effective for the period from September 28, 1983, to August 16, 1984.

On June 11, 1984, the appellant filed a claim for mine subsidence damage in which he listed an October 10, 1983, date of loss. Pursuant to regulations governing the adjustment of such claims, State Farm reported the claim to the Board of Risk, and the appellant's claim was then assigned to the General Adjustment Bureau for investigation. This independent adjuster interviewed the appellant and inspected the property on July 24, 1984. In a February 6, 1985, letter to the General Adjustment Bureau, the Board of Risk advised that they did not feel that there was coverage. The Board of Risk met on February 19, 1985, and the minutes of that meeting reflect that with respect to the appellant's claim, "[t]he Board denied reinsurance coverage because the subsidence began in 1981, long before the mine subsidence coverage was requested."

In a letter dated March 18, 1985, Board of Risk Claim Manager T. K. Snyder told State Farm Claim Superintendent Joseph Rheney that "the Board [of Risk] met on March 12, 1985 and again decided that *no reinsurance is available for homes where there is ongoing mine subsidence.* The damage to [appellant Higginbotham's] house began many years ago. We are instructing [General Adjustment Bureau Adjuster] John Roberts to close his file and you may proceed as your corporate policy dictates."

State Farm subsequently requested an independent investigation, which took place in June, 1985. An investigator for Triad Engineering concluded that "we believe the distress cracking and movement in the house have been caused by soil movements on the uphill side of the house. We do not believe it is caused by subsidence, but the possibility of subsidence causing the movement will be investigated in a detailed study by the West Virginia DNR in the future."

State Farm denied the appellant's claim on July 15, 1985, but the reason given at that time was not prior mine subsidence. Instead, the appellant was informed that the "earth movement" damage to his home was not covered under his homeowner's

---

**2.** West Virginia Code § 33–30–6 (1992) states, in part, that beginning October 1, 1982, "every insurance policy issued or renewed insuring on a direct basis a structure located in this state shall include, at a separately stated premium, insurance for loss occurring on or after [October 1, 1982], caused by mine subsidence unless caused by mine subsidence unless waived by the insured...."

**3.** At a hearing on January 26, 1989, State Farm insurance agent Joe Woodward explained that after the legislation was passed in 1982, "[t]he company automatically gave [mine subsidence] coverage from that point to the policyholder. [State Farm] didn't add the [mine subsidence] coverage in writing until their next due date, which was August 16, 1983. At that time, then, they sent the new Declaration Page, showing the mine subsidence coverage and, also, the charge for it. The customer had the opportunity to refuse the mine subsidence by signing a form, saying, 'I don't want it.'"

policy.[4] State Farm also told the appellant that the Abandoned Mine Lands Program would perform a detailed investigation of his house within the next two to three years: "When that report is completed, we will review its findings at that time. If that report does indicate that your damages are caused by mine subsidence, we will reconsider this matter."

Several years later, the appellant submitted additional evidence and requested that his claim be reconsidered. In a letter to the appellant dated March 23, 1987, State Farm Claim Superintendent Joseph L. Rheney again mentioned "earth movement" as a possible reason why State Farm might deny coverage for a loss:

... In any question of coverage relating to the mine subsidence portion of the policy, the State Board of Insurance [Board of Risk] has the authority for resolution of such question and not State Farm itself.

It is further not uncommon for the damage stated in the loss report completed by you to be as a result of some type of earth movement other than mine subsidence. This type of damage is excluded under your policy. If the investigation of your claim should determine that the damage to your residence was caused by perils such as earth movement as described in your policy, State Farm reserves its right to deny coverage to you for such loss.

In a March 31, 1987, letter, Board of Risk Claims Manager James L. Boone informed State Farm Claim Superintendent Rheney that "[a] review of the [appellant's] claim file reveals it was established, *this insured does not qualify for Coal Mine Subsidence Insurance Coverage*, because he had subsidence prior to the inception of the

policy. Our position has not changed, and you should so advise Mr. Higginbotham."

Although the insurer has no recourse in this situation and is bound by the Board of Risk's determination, State Farm apparently felt that any subsidence damage that occurred after the insurance coverage was purchased should be covered.[5] Nonetheless, State Farm had to deny coverage and offered the appellant the following explanation in a May 19, 1987, letter from Claim Superintendent Rheney:

As per your request, we reopened your mine subsidence claim and resubmitted it to the State Board of Risk and Insurance Management. As you will recall, as per the regulations governing the processing of mine subsidence claims, it is entirely up to the State Board to determine whether the mine subsidence coverage will apply to such claims. The State Board has responded to the request to reopen this claim and to determine whether mine subsidence coverage can be extended. The State Board has indicated that your loss does not qualify for Coal Mine Subsidence Insurance Coverage because the subsidence experienced at your dwelling occurred prior to the inception of your Mine Subsidence Endorsement. A copy of the State Board's letter is enclosed for your review.

The Board has consistently taken the position that if mine subsidence has occurred prior to the inception of the policy, then the Mine Subsidence Insurance Coverage will not be extended to cover the loss. The State Board has indicated that they have based their decision upon the determination that the mine subsidence damage at your dwelling occurred in 1979 while the Mine Subsidence Coverage was not in effect until August 1983.

**4.** The coal mine subsidence coverage part of the appellant's policy states that "[t]he insurance afforded by this coverage part does not insure against loss caused by (1) Earthquake, landslide, volcanic eruption, collapse of storm and sewer drains and rapid transit tunnels *or earth movement other than underground coal mine subsidence; ....*" (Emphasis added.)

**5.** In a letter dated February 26, 1985, State Farm Claim Superintendent Joseph Rheney told

Mr. T.K. Snyder of the Board of Risk that "... it is State Farm's position that we would owe the policy holder for the damage which occurred since his purchase of the Mine Subsidence Endorsement. Consequently, we ask that the State Board advise us as to how much that damage is so that we may make a proper payment."

Once again, the Company is bound by the Board's decision. Therefore, we regretfully inform you that your claim for mine subsidence damage is denied.

Whenever the State Board determines that denial of a mine subsidence claim is in order because the subsidence damage preceded the effective date of the endorsement, this Company has taken the position that the insured's premiums paid for the Mine Subsidence Endorsement shall be returned. Therefore, we are presently informing our Underwriting and Accounting Departments of our decision to return the premiums you have paid for your Mine Subsidence Coverage.

■ The appellant appealed this decision to the Insurance Commissioner and demanded a hearing on the matter pursuant to W.Va.Code § 33–2–13,[6] and § 33–30–7 (1992), which addresses the "limited right of insurers to refuse to provide subsidence coverage:"

An insurer may refuse to provide subsidence coverage (1) on a structure evidencing unrepaired subsidence damage, until necessary repairs are made; or (2) where the insurer has declined, nonrenewed or cancelled all coverage under a policy for underwriting reasons unrelated to mine subsidence: Provided, That an insurer shall refuse to provide subsidence coverage on a structure which evidences a loss or damage in progress.

Any dispute arising under this section shall be subject to the hearing and appeal provisions of article two [§ 33–2–1 et seq.] of this chapter.

At a January 26, 1989, hearing before examiner Michael A. Braun, the appellant presented evidence to dispute the Board of Risk's finding that subsidence had occurred prior to the inception of the insurance policy. For example, after the appellant first noticed small cracks in his home in 1978, he complained to the West Virginia Department of Mines and the United States Office of Surface Mining. The State determined that the cracks were due to construction

defects, not mine subsidence, while the Office of Surface Mining concluded, "There is unanimous agreement that the problems with your home are not mine caused or related."

These investigations took place before the appellant acquired the mine subsidence insurance coverage. However, after the appellant obtained this insurance, the house began to move, which prompted him to file the mine subsidence claim with State Farm in 1985.

In 1987, a West Virginia Department of Energy investigation was conducted through a contract with CTL Engineering of West Virginia, Inc. The president of this firm, Patrick Gallagher, inspected the appellant's house, the surrounding area, and the mine map, and he performed a subsurface investigation by drilling. An expert on mine subsidence, Gallagher testified at the January 26, 1989, hearing that he saw old "construction type cracks" as well as "very fresh" and "active" cracks in the house. He stated that the fresh cracks were typical of subsidence damage, that "the house was undergoing a tremendous amount of tension," and damage to the house was severe. Gallagher also expressed his basic agreement with the opinions in the 1978–79 reports from the Department of Energy and Office of Surface Mining that the damage witnessed at that time was not related to mine subsidence but to some type of construction defect.

Board of Risk Claims Manager James Lee Boone also testified at the January 26, 1989, hearing. He indicated that it was the Board's policy to deny insurance coverage when the Board determines that subsidence occurred prior to the inception of the insurance policy. Boone wrote the March 31, 1987, letter to State Farm in which he advised that "this insured does not qualify for Coal Mine Subsidence Insurance Coverage. . . ." Boone was cross-examined on this point at the hearing and asked how it could be that the appellant did not qualify for coverage when, in fact, he was already

---

**6.** West Virginia Code § 33–2–13 (1992) states, in part, that "[t]he [insurance] commissioner may call and hold hearings for any purpose deemed

necessary by him for the performance of his duties."

covered. Boone replied, "They were covered. What the letter intended was that they did not qualify to be paid a claim under the policy."

Upon completion of the hearing, the hearing examiner *sua sponte* recommended that the Insurance Commissioner dismiss the appellant's claim for lack of subject matter jurisdiction. In an order entered May 15, 1989, the examiner opined that:

> [I]t would be inappropriate for the Insurance Commissioner to attempt to review decision of the Board based in part on rules and regulations adopted by the Board and not the Insurance Commissioner. A party aggrieved by what he perceives is a wrong decision by a state board or agency exercising its quasi judicial powers cannot appeal to another state agency, board or commission.

The Insurance Commissioner entered an order affirming the hearing examiner's recommendation on May 18, 1989, and the appellant appealed to the Circuit Court of Kanawha County.

In a final order entered on April 21, 1992, the Circuit Court of Kanawha County affirmed the Insurance Commissioner's decision. The lower court explained that the jurisdiction granted to the Insurance Commissioner by W.Va.Code § 33–30–7 is limited to disputes in which an insurer has refused to provide mine subsidence insurance coverage. The court found that this was not such a situation because "State Farm issued the [appellant] mine subsidence coverage and the [appellant] does not dispute this fact. Therefore, the petitioner has admitted that this is not a dispute involving the refusal of State Farm to provide mine subsidence coverage but whether or not a claim should or should not be honored under such coverage."

The circuit court concluded that once State Farm provided coverage, "the jurisdiction of the Insurance Commissioner ended. Therefore, the [appellant's] proper remedy as to the denial of his claim by the Board of Risk was to appeal to either the Kanawha County or the Marion County Circuit Court...."

However, on appeal, the appellant maintains it was error for the Insurance Commissioner to refuse to resolve the mine subsidence coverage dispute after State Farm retroactively cancelled his mine subsidence coverage and tendered a premium refund. The appellant now argues that ultimately, State Farm's actions constitute a refusal to provide insurance coverage, which brings this dispute squarely within the Insurance Commissioner's jurisdiction under W.Va.Code § 33–30–7.

In his brief, the appellant points out that W.Va.Code § 33–30–7 "plainly and explicitly provides that disputes arising upon an insurer's refusal to provide subsidence coverage are subject to hearing before the Insurance Commissioner." Therefore, we must determine whether the appellant was effectively denied coverage within the meaning contemplated by W.Va.Code § 33–30–7, or whether this was simply a matter of the appellant's claim being rejected, in this particular instance, pursuant to the authority vested in the Board of Risk to settle and adjust claims.

As we noted above, the statutory scheme which regulates mine subsidence insurance in this State gives the Insurance Commissioner authority to conduct hearings when an insurer refuses to provide coverage for one of the reasons set forth in W.Va.Code § 33–30–7: "Any dispute arising under this section shall be subject to the hearing and appeal provisions of Article two [§ 33–2–1 *et seq.*] of this chapter." By contrast, the Board of Risk's jurisdiction extends to settlement questions and the adjustment of claims. Pursuant to regulations promulgated by the Board of Risk, claims are administered in the following manner:

> 4.1 Administration of claims. All mine subsidence claims shall be reported to the Board for assignment to qualified independent adjusting firms in accordance with claim procedures as outlined on Appendix D. The selected adjusting firm will send all reports simultaneously to the insurer and the Board with all settlement authority, coverage questions and related matters being resolved by the Board. The Board will reimburse the insurer for all sums expended in accor-

dance with the provisions of the reinsurance agreement.

115 W.V.C.S.R. 1–4.1.

This regulation makes it clear that the insurer acts merely as an agent of the State and is bound by the Board's decisions, because "all settlement authority, coverage questions and related matters" are to be resolved by the Board. What is not at all clear, however, is what recourse an insured has if aggrieved by a Board of Risk decision.

The lack of clarity on this point can probably be attributed, at least in part, to the fact that the parties repeatedly refer to the Board of Risk's mine subsidence arrangement with insurers as "reinsurance," even though this is not a traditional reinsurance agreement. For this reason, we feel it is necessary for the Board of Risk to set forth in its regulations some procedural guidelines applicable to this variation on the reinsurance contract.

Reinsurance is defined as "insurance purchased by one underwriter from another, the latter wholly or partially indemnifying the former against the risks that it has assumed. The rights as between the underwriters are governed by the terms of the reinsurance contract." Allan D. Windt, *Insurance Claims and Disputes* § 7.10 (2d ed.1998).

An example of why there is confusion on this issue is evident when one tries to determine exactly what rights, if any, an insured has against the Board of Risk. Where a typical reinsurance contract is involved, "there is no privity ... between the original insured and the reinsurer; as a result, it is generally recognized that the original insured cannot recover directly from the reinsurer." *Id.*

Nonetheless, in this case, the Board of Risk argues, and the court below also stated, that, finding himself aggrieved by the Board's decision and State Farm's subsequent retroactive cancellation of his mine subsidence coverage, the appellant should have appealed to circuit court, pursuant to W.Va.Code § 29A–5–4, instead of demanding the hearing before the Insurance Commissioner. However, this type of judicial review of the Board's decision would seem to suggest that the appellant should have at least an administrative hearing below at which an evidentiary record can be established.

Unfortunately, the administrative framework promulgated by the Board of Risk lacks any specific procedures which give insureds the opportunity to be heard or otherwise present evidence relevant to their claims. In this case, we can only assume the appellant had some open line of communication with the Board of Risk through his insurer, State Farm, and thus, that the Board was made aware of the evidence the appellant had which supported his position that his home had not sustained subsidence damage prior to the inception of his policy. Although the record indicates that the appellant submitted additional evidence to support a request for reconsideration of his claim, exactly how this was done is not at all clear. Given that the appellant stood to lose insurance coverage that he believed he was entitled to for over two years, we find a certain element of unfairness in the process by which the Board decided that even though he had paid premiums and received a mine subsidence coverage endorsement, he was, in fact, not qualified to receive such coverage.

Fundamental principles of due process require that the Board of Risk set forth procedures whereby insureds may present evidence and establish a record upon which the Board can base any decision regarding a claim. "This Court in the past has required the application of due process standards in proceedings where governmental bodies have deprived a person of a property right." *North v. West Virginia Board of Regents,* 160 W.Va. 248, 255, 233 S.E.2d 411, 416 (1977). While this Court "has generally been content to approach the question of due process on a case by case basis ... certain fundamental principles in regard to procedural due process can be stated." *Id.* at 256, 233 S.E.2d at 416–17.

First, the more valuable the right sought to be deprived, the more safeguards will be interposed. Second, due process must

generally be given before the deprivation occurs unless a compelling public policy dictates otherwise. Third, a temporary deprivation of rights may not require as large a measure of procedural due process protection as a permanent deprivation.

*Id.* at syl. pt. 2, in part.

Because of the way in which the supposed "rejection" of his initial claim was handled, and because he continued to pay premiums, the appellant herein continued to believe for over two years that he actually had mine subsidence insurance coverage. The inherent unfairness of this type of situation for an insured whose coverage is eventually cancelled is obvious and thus we believe some procedural safeguards are necessary. Since it is the Board of Risk, not the insurer, that ultimately decides the fate of an insured's mine subsidence claim, or, as in this case, tells the insurer that insurance never should have been provided, procedures should be implemented to afford an insured the opportunity to present the Board with any evidence he may have in support of his claim.

■ Having briefly noted our problems with the lack of procedural specificity in the Board's regulations, we turn now to address the primary issue before the Court, which is whether the Insurance Commissioner had jurisdiction to hear the appellant's appeal after his mine subsidence insurance coverage was cancelled. There is no question but that this case presents a unique set of facts. The appellant's initial claim was rejected by the Board of Risk. Then, acting in its capacity as the Board of Risk's agent and pursuant to the Board's directive, State Farm informed the appellant of this decision. Nonetheless, the appellant continued to pay premiums to State Farm and believed that he had mine subsidence insurance. However, when the appellant requested a reconsideration of his claim over two years later, State Farm not only denied coverage once again, but also cancelled the appellant's mine subsidence coverage and tendered a refund of his premiums.

As we noted above, a provision in the Coal Mine Subsidence Coverage part of the appellant's policy states that "[t]he coverage afforded by this coverage part may not be cancelled by the company unless the entire policy is cancelled." This point is not raised by either party, so we have no explanation for why this apparently did not occur in this case. Perhaps State Farm did not consider its refund of the appellant's premiums to constitute a cancellation of his mine subsidence coverage. We know of no other way to describe it. In the final analysis, however, this does not alter our conclusion: not only did the Board of Risk exercise its authority to adjust a claim—and, in this case, reject it—pursuant to W.V.C.S.R. 1–4.1, but, acting in accordance with the Board's determination, the insurer, State Farm, retroactively denied the appellant any mine subsidence coverage at all for one of the limited reasons set forth in W.Va.Code § 33–30–7.

The language contained in the two Board of Risk letters to State Farm leaves no doubt that the Board never intended for the appellant to receive mine subsidence insurance coverage. However, because the statutory directive in W.Va.Code § 33–30–6 required that coverage be provided automatically unless waived, State Farm did not get an opportunity to tell the appellant, in effect, "We won't ever provide coverage for this house because you have pre-existing subsidence damage," until after he filed his first claim under the policy on June 11, 1984. Even then, State Farm did not tell the appellant that a claim on this house would never be covered because of the prior damage.

Nonetheless, the first March 18, 1985, letter from the Board of Risk to State Farm which addressed the appellant's situation stated succinctly that "*no reinsurance is available* for homes where there is ongoing mine subsidence," and that because damage to the appellant's home "began many years ago," his file would be closed. State Farm was instructed to "proceed as your corporate policy dictates."

However, State Farm apparently took no action beyond denying the appellant's ini-

tial claim. So, while the appellant continued to pay his premiums, he also continued to believe that he had mine subsidence insurance coverage. Finally, however, after he requested a reconsideration of the denial of his claim, the Board of Risk again reiterated its position to State Farm, stating in a March 31, 1987, letter, that "[a] review of the [appellant's] claim file reveals *it was established, this insured does not qualify for Coal Mine Subsidence Insurance Coverage....*"

State Farm finally related this information to the appellant in a May 19, 1987, letter. However, this time State Farm also explained that in these situations, "this Company has taken the position that the insured's premiums paid for the Mine Subsidence Endorsement shall be returned."

It is now obvious that the appellant no longer has mine subsidence insurance coverage at all. Consequently, the appellant requests that this Court remand this case to the Insurance Commissioner for a decision on the coverage issue, i.e., whether the appellant is entitled to mine subsidence insurance, or whether the insurance company is within its limited right to refuse coverage as provided in W.Va.Code § 33–30–7. The appellant argues that if he receives a favorable decision from the Insurance Commissioner, the Board of Risk must then adjust his claim.

We agree with the argument advanced by the appellant on this issue. The effect of State Farm's cancellation of the appellant's mine subsidence coverage and its refund of his premiums is the same, retroactively, as if the appellant had never been offered the insurance coverage at all. When the Board of Risk determined that "this insured *does not qualify* for Coal Mine Subsidence Insurance Coverage," it was instructing the insurance company, acting as its agent, to refuse to provide the appellant with this type of coverage because of subsidence damage his house had allegedly sustained prior to the effective date of the policy. West Virginia Code § 33–30–7 states that the *"insurer may refuse* to provide subsidence coverage (1) on a structure evidencing unrepaired subsi-

dence damage, until necessary repairs are made ...," but also explains that *"an insurer shall refuse* to provide subsidence coverage on a structure which evidences a loss or damage in progress." (Emphasis added.)

We realize, of course, that initially State Farm did not refuse the appellant mine subsidence coverage. Technically, State Farm did issue the appellant a policy. However, any guarantee of actual coverage was an illusion facilitated by the mandate in W.Va.Code § 33–30–6, which provided that subsidence coverage would automatically be added to policies unless waived. After the appellant filed his first claim under this policy in which he alleged mine subsidence damage, the Board clearly told the insurance company that the appellant *did not qualify* for mine subsidence coverage. However, it was not until two years later that his coverage was cancelled and his premiums refunded. Because State Farm's reason for ultimately refusing to provide the appellant with *any coverage at all* is one of the reasons set forth in W.Va.Code § 33–30–7, we find that the Insurance Commissioner does indeed have jurisdiction over this dispute. West Virginia Code § 33–30–7 states that, "[a]ny dispute arising under this section shall be subject to the hearing and appeal provisions of article two [§ 33–2–1 et seq.] of this chapter," which relates to the Insurance Commissioner.

Contrary to the appellee's assertions, this is not a review by one agency (the Insurance Commissioner) of the actions of another (the Board of Risk). Rather than reviewing the Board of Risk's rejection of the appellant's initial claim, the Insurance Commissioner is now instructed to review the subsequent retroactive cancellation of the appellant's mine subsidence coverage. We realize that this cancellation occurred as a result of the Board of Risk's directive to the insurer that the appellant did not qualify for such coverage. However, W.Va. Code § 33–30–7 gives the Insurance Commissioner jurisdiction to review coverage questions in several limited instances where coverage has been denied, as was done retroactively in this case.

To summarize, we conclude that even where mine subsidence coverage has initially been extended to a policyholder pursuant to statutory directive, the retroactive cancellation of an insured's coverage for one of the reasons set forth in W.Va.Code § 33–30–7 may be interpreted as a refusal to provide mine subsidence coverage. Such refusal to provide coverage is subject to review by the Insurance Commissioner, who has jurisdiction under the hearing and appeal provisions of W.Va.Code § 33–2–1 et seq., as noted in W.Va.Code § 33–30–7.

For the reasons set forth above, we reverse the April 22, 1992, ruling of the Circuit Court of Kanawha County and remand this case to the Insurance Commissioner for proceedings consistent with this opinion.

Reversed and remanded.

MILLER, Justice, concurring:

I agree with the majority that the due process rights of the appellant in this case have been violated, and thus the order of the trial court must be reversed. However, because I disagree with the procedure utilized by the majority to protect the due process rights of the appellant, I respectfully concur.

The facts of this case make clear that the appellant paid premiums to his insurance company, State Farm Fire & Casualty Company (State Farm), to cover damage to his house caused by mine subsidence. Mine subsidence insurance coverage was issued to the appellant under the mandate of W.Va.Code, 33–30–1, et seq., which dictates that all insurance policies issued or renewed in this State which insure a structure must include mine subsidence insurance coverage at a separate premium from the direct insurance.[1] An insured may then waive such coverage, and thus not be liable for the separate mine subsidence coverage premiums, at his discretion.[2] The appellant in this case did not waive mine subsidence coverage, and his premiums for that coverage were paid to and collected by State Farm.

Under W.Va.Code, 33–30–1, et seq., a rather complex bureaucratic system exists to ensure that eligible insureds receive mine subsidence coverage.[3] The system works as follows: (1) the statute mandates that mine subsidence coverage be granted to all eligible insureds unless they affirmatively waive such coverage; (2) the insured pays a mine subsidence coverage premium to the insurer; (3) the insurer then forwards the premium, minus a "ceding commission," to the state board of risk and insurance management[4] (Board); (4) the Board "is authorized to undertake adjustment of losses and administer the fund" under W.Va.Code, 33–30–8; and (5) whenever a mine subsidence claim is submitted

---

1. Other states have also set up mine subsidence insurance funds. See, e.g., Ohio Rev.Code Ann. § 3929.50, et seq. (Anderson 1985); Pa.Stat. Ann. tit. 52, § 3201, et seq. (1972).

2. W.Va.Code, 33–30–6 (1985), provides, inter alia, that mine subsidence insurance provided for structures in certain counties named therein need only be provided if requested by the insured. Most counties, however, are covered by the formula stated in the text.

3. The legislature outlined its purpose in mandating mine subsidence coverage availability in this State in W.Va.Code, 33–30–1 and –2 (1982):

33–30–1: "Mine subsidence in this State has resulted in great loss of home, shelter and property to the citizens of this State to the detriment of the health, safety and welfare of such citizens and programs for the alleviation of such problems constitute the carrying out a public purpose...."

"33–30–2: The purpose of this article is to make mine subsidence insurance available in a reasonable and equitable manner to all residents of this State through the office of the state board of risk and insurance management."

4. W.Va.Code, 33–30–8 (1985) and –9 (1982), allow the insurer to retain a "ceding commission" in return for the insurer "agree[ing] to absorb all [its] expenses ... necessary for the sale of policies and any administration duties of the mine subsidence insurance program imposed upon it pursuant to the terms of the reinsurance agreement," entered into by the insurer with the Board. The Board has the power to fix the proportion of the premium retained by the insurer as a ceding commission. That proportion is fixed by virtue of 8 W.Va.C.S.R. § 115–1–3.8, whereby the insurer retains 30 percent of the gross premium collected for mine subsidence coverage from each insured as the ceding commission.

to an insurer, it must "be reported to the Board for assignment to qualified independent adjusting firms.... The selected adjusting firm will send all reports simultaneously to the insurer and the Board *with all settlement authority, coverage questions and related matters being resolved by the Board.*" 8 W.Va.C.S.R. § 115–1–4.1.[5] (Emphasis added).

Neither the statute (W.Va.Code, 33–30–1, *et seq.*) nor the applicable provisions in the West Virginia Code of State Rules (8 W.Va. C.S.R. 115–1–1, *et seq.*) delineate any procedure whereby an insured may present evidence supporting a claim brought pursuant to mine subsidence insurance coverage. Although the Board is the governmental entity charged with adjusting the mine subsidence claims of an insured, the insured, under the statute and the Code of State Rules, is not granted direct contact with the Board. As the majority correctly points out, "[f]undamental principles of due process require that the Board ... set forth procedures whereby insureds may present evidence and establish a record upon which the Board can base any decision regarding a claim." 189 W.Va. 507, 510, 432 S.E.2d 774, 780, *citing North v. W.Va. Bd. of Regents,* 160 W.Va. 248, 256, 233 S.E.2d 411, 416 (1977).[6]

There is ample authority to support the proposition that a valid insurance policy is a property interest which cannot be taken without some procedural due process. *See, e.g., North v. West Virginia Bd. of Regents, supra; Campbell v. Kelly,* 157 W.Va. 453, 461–62, 202 S.E.2d 369, 375 (1974) ("For the average working person, the most valuable *property rights* ... con-

sist of social security benefits, *insurance contracts,* union welfare fund benefits and private and governmental pensions." (Emphasis added).). *See also Lynch v. United States,* 292 U.S. 571, 577, 54 S.Ct. 840, 842, 78 L.Ed. 1434, 1439 (1934) ("[W]ar risk [insurance] policies, being contracts, are property and create vested rights."); *United States v. Bess,* 357 U.S. 51, 56, 78 S.Ct. 1054, 1058, 2 L.Ed.2d 1135, 1141 (1958) (the cash remainder value of a life insurance policy is a property interest); *Sims v. Order of United Commercial Travelers of Am.,* 343 F.Supp. 112, 115 (D.Mass.1972) ("[T]he purchaser of a life insurance policy makes an investment decision whereby he purchases a promise to pay.... That promise to pay is *'property'* of substantial value to the purchaser[.]" (Emphasis added).). Indeed, in most instances, the insured vindicates the property interest by suing the insurer in court to obtain coverage and damages for the denial of coverage. *See Smithson v. United States Fidelity & Guaranty Co.,* 186 W.Va. 195, 411 S.E.2d 850 (1991); *Thomas v. State Farm Mut. Auto. Ins. Co.,* 181 W.Va. 604, 383 S.E.2d 786 (1989); *Hayseeds, Inc. v. State Farm Fire & Casualty Co.,* 177 W.Va. 323, 352 S.E.2d 73 (1986).

The majority, following its due process concept, orders that "procedures should be implemented to afford an insured the opportunity to present the Board with any evidence he may have in support of his claim[.]" 189 W.Va. at 511, 432 S.E.2d at 781. Unfortunately, the majority goes on to require that the appellee, the State Insurance Commissioner, and not the Board,

---

**5.** 8 W.Va.C.S.R. § 115–1–1 *et seq.,* was promulgated by the Board pursuant to its authority under W.Va.Code, 33–30–15 (1982), which provides: "The board is authorized to promulgate and adopt such rules and regulations relating to mine subsidence insurance as are necessary to effectuate the provisions of this article. Such rules and regulations shall be promulgated and adopted pursuant to the provisions of chapter twenty-nine-a [§ 29A–1–1 et seq.] of this Code."

**6.** In Syllabus Point 2 of *North,* we stated:
"Applicable standards for procedural due process, outside the criminal area, may depend upon the particular circumstances of a given case. However, there are certain funda-

mental principles in regard to procedural due process embodied in Article III, Section 10 of the *West Virginia Constitution,* which are; First, the more valuable the right sought to be deprived, the more safeguards will be interposed. Second, due process must generally be given before the deprivation occurs unless a compelling public policy dictates otherwise. Third, a temporary deprivation of rights may not require as large a measure of procedural due process protection as a permanent deprivation."
*See also Matthews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

should hold the hearing in this case to resolve the disputed issue. I believe that the majority's premise in ordering the Insurance Commissioner to hold hearings on this matter is erroneous.

It is clear to me that this is not a dispute over coverage under W.Va.Code, 33–30–7 (1985), which gives the Insurance Commissioner the right to hold a hearing. That section concerns only the initial procurement of the subsidence coverage. It allows an *insurer* to decline this coverage if "a structure evidenc[es] unrepaired subsidence damage, until necessary repairs are made" or where the "structure ... evidences a loss or damage in progress." [7] The second basis for a hearing in front of the Insurance Commissioner under W.Va. Code, 33–30–7, is "where the insurer has declined, nonrenewed or canceled *all coverage* under a policy for underwriting reasons unrelated to mine subsidence[.]" (Emphasis added).

It is obvious that neither of the conditions outlined in W.Va.Code, 33–30–7, occurred in this case. The policy was issued with subsidence coverage. The appellant faithfully paid premiums for five years to cover potential damage to his home from mine subsidence and these premiums were accepted by the insurer. There was no cancellation of all coverage for underwriting reasons by the insurer. Thus, none of the conditions described in W.Va.Code, 33–30–7, that could trigger a hearing with the Insurance Commissioner existed.

Because coverage was granted and the premium paid and accepted and no underwriting reasons for canceling the entire policy exist, W.Va.Code, 33–30–7, is not applicable. The Insurance Commissioner is out of the picture because only by virtue of the reasons set out in W.Va.Code, 33–30–7,

may the Insurance Commissioner hold a hearing. Where a subsidence loss is claimed to have occurred *after the policy is issued*, as was the case here, the Board is required to act under W.Va.Code, 33–30–8. This section requires the Board to undertake the adjustment of the loss or, through its agreement with the insurer, direct the insurer to do so.[8] Although the Board undertook to adjust the appellant's claim in this case, it failed to provide him with his due process right to appear and offer evidence on his behalf.

I agree with the majority that the appellant's constitutional right to due process has not been met in this case and a remand is therefore necessary. However, for the reasons stated above, I believe that the Board, and not the Insurance Commissioner, should provide that due process to the appellant.

---

**7.** W.Va.Code, 33–30–7, states:

"An insurer may refuse to provide subsidence coverage (1) on a structure evidencing unrepaired subsidence damage, until necessary repairs are made; or (2) where the insurer has declined, nonrenewed or canceled all coverage under a policy for underwriting reasons unrelated to mine subsidence: Provided, That an insurer shall refuse to provide subsidence coverage on a structure which evidences a loss or damage in progress."

**8.** W.Va.Code, 33–30–8, in relevant part, states:

"The Board is authorized to undertake adjustment of losses and administer the fund, or it may provide in a reinsurance agreement that the insurer do so. The board shall agree to reimburse the insurer from the fund for all amounts paid policyholders for claims resulting from mine subsidence and shall pay from the fund all costs of administration incurred by the board[.]"