**FILED**

**June 12, 2024**

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 22-0378 – *Frye v. Erie Insurance Co.*

WOOTON, Justice, concurring, in part, and dissenting, in part:

I concur in the majority's decision to vacate the order denying petitioner Brian Frye's motion pursuant to West Virginia Rule of Civil Procedure 59(e) and remand for further proceedings. However, I dissent to the refusal to also reverse the circuit court's award of summary judgment to respondent Erie Insurance Company ("Erie"); that refusal evades and improperly endorses the circuit court's erroneous ruling that insureds like petitioner Frye may not sue their insurer for alleged improper denial of mine subsidence claims. As it stands, the majority has left in place a determination that mine subsidence insureds in West Virginia cannot sue the party with whom they contracted for wrongful denial of such coverage, and remands merely in the hope that the Attorney General of West Virginia will intervene and explain what insureds are to do. That result cannot stand and accordingly, I respectfully dissent in that regard.

As indicated, the majority's resolution vacates only the order denying petitioner's Rule 59(e) motion and remands for notice to be given under West Virginia Rule of Civil Procedure 24(c), thus allowing the Attorney General the opportunity to seek intervention and defend the constitutionality of the mine subsidence insurance statutory scheme. And while perhaps procedurally permissible, this resolution does both too much and too little. It does too much in that it casts a pall of unconstitutionality over the mine subsidence insurance statutory scheme where none actually exists. It is not these statutes

1

that unconstitutionally deprive petitioner of a remedy. Instead, it is the circuit court's ruling that an insured cannot sue his insurer for breach of contract arising from alleged wrongful denial of coverage that deprives him of a remedy—a legal error we can and should fix. In that regard, the majority's resolution does too little. Despite wringing its hands about an insured's ostensible lack of recourse for an alleged wrongful denial of a claim at the hands of the West Virginia Board of Risk and Insurance Management ("BRIM"), the majority's resolution evades the underlying error which, if corrected, would solidify petitioner's remedy and render the State's Rule 24(c) intervention unnecessary.

Petitioner filed a breach of contract action, along with an Unfair Trade Practices Act claim, against his first-party insurer, Erie. As with any insured/insurer or other contractual relationship, petitioner and Erie's relationship is governed by the terms of their contract. Like any insured in West Virginia, petitioner may bring an action for breach of contract if he believes his claim was wrongfully denied, and may seek first-party damages resulting from that denial. Petitioner's contract of insurance with Erie—even as to the mine subsidence coverage added by endorsement—is governed by the terms and conditions set forth in that policy. Endorsements for specific coverages are not novel and are governed by ordinary contractual principles, as contemplated in the policy language discussed below.

In that regard, the "Agreement" portion of petitioner's insurance policy with Erie provides: "[**W**]e agree to provide the coverages you have purchased." The "Rights

2

and Duties" provision states that "[**w**]**e** will settle any claim for loss with **you**." The term "we" is one of "special meaning" under the policy which provides: "'**We**', '**us**' or '**our**' means the Erie Insurance Property & Casualty Company." The policy further provides that "[t]his important contract between YOU and The ERIE consists of this policy with coverage agreements, limitations, exclusions and conditions, a **Declarations**, *plus any endorsements*."[1] (Emphasis added). It states further that "[t]his policy, *all endorsements to it*, and the Subscriber's Agreement constitute *the entire agreement* between **you** and **us**." (Emphasis added). This language forms the boundaries of Erie's agreement to provide coverage to petitioner; where it wrongfully fails to do so, petitioner unquestionably has a first party cause of action against it. Nowhere in this contract of insurance does petitioner contract with BRIM for coverage, or agree to Erie's delegation—or BRIM's assumption—of Erie's obligations under the contract.

---

[1] The mine subsidence coverage is set forth in an endorsement entitled "West Virginia Coal Mine Subsidence Coverage Part Endorsement" which outlines, inter alia, coverage, exclusions, and other sundry provisions including a lengthy arbitration provision which provides for arbitration only if BRIM and the insured "mutually consent[.]" Although this endorsement language includes an occasional reference to BRIM, it is always in conjunction with "the company" or not at all. "The company" is expressly defined as "the company providing this insurance as designated on the Declarations."

As its final provision, that endorsement states that "ALL OTHER PROVISIONS OF THE POLICY APPLY." Nowhere does the endorsement reflect an agreement by petitioner to Erie's delegation of its contractual obligations, nor could it reasonably do so in light of all the other language unequivocally demonstrating that petitioner has contracted solely with Erie for the coverage outlined in the policy and as governed exclusively by the terms of that policy.

Therefore, the confounder in this case lies not in the insurance policy between petitioner and Erie, but the significance of the statutory mine subsidence insurance scheme and the reinsurance arrangement between Erie and BRIM. However, the circuit court failed to analyze this scheme to any meaningful degree, deciding that simply because the statutes grant claims handling and settlement authority to BRIM, any contractual obligations owed by Erie to petitioner are nullified. The circuit court reached this conclusion without examining the Reinsurance Agreement between Erie and BRIM or any of the law applicable to reinsurance. If it had done so, it would have found that there is nothing so fundamentally unusual about BRIM's reinsurance arrangement with Erie as to warrant concluding that petitioner's contractual rights have been rendered unenforceable. More importantly, the circuit court would have discovered that any significant differences in the reinsurance arrangement actually inure to petitioner's benefit, rather than destroy his cause of action.

As evidence of the typicality of the reinsurance arrangement between BRIM and Erie, the mine subsidence endorsement appended to Erie's policy references the mine subsidence insurance fund as providing "reimburse[ment] [of] the company[]"—just as with any reinsurance. BRIM's own Deputy Director stated in a letter to petitioner's counsel that BRIM "basically serves as a reinsurer for Erie[.]" Most importantly, however, the statutory scheme itself requires that Erie execute a "Reinsurance Agreement" as set forth in Appendix F to the governing regulations. *See* W. Va. Code R. § 115-1-3.9 ("Reinsurance agreement. -- Each insurance company subject to this rule shall enter into a reinsurance

4

agreement with the Board. Refer to Appendix F for the wording of the Reinsurance Agreement."). Although not particularly extensive, the Reinsurance Agreement at its essence functions conceptually as most reinsurance does.

Instead, the circuit court became preoccupied with the statutory particulars of the interplay between Erie and BRIM. Perhaps influenced by an unexplained, stray comment in *Higginbotham v. Clark*, 189 W. Va. 504, 432 S.E.2d 774 (1993), that this is "not a traditional reinsurance agreement[,]" the circuit court ignored longstanding reinsurance principles and summarily determined that the statutory reinsurance arrangement effectively rendered Erie immune from suit. *Id*. at 510, 432 S.E.2d at 780. *Higginbotham* did not explain precisely why it deemed the reinsurance non-"traditional" but more importantly, the case fails to explain the *significance* of that difference relative to the rights of the original insured.[2] For all pertinent purposes—and in particular for purposes of petitioner's right of action against Erie—BRIM is Erie's self-proclaimed and statutory reinsurer, and no party identifies why it should not be treated as such.[3]

---

[2] As discussed by the majority, although *Higginbotham* chastises the Legislature for failing to include a method for obtaining review of claims decisions, the case was procedurally postured as an insured's attempted litigation of his retroactive policy cancellation before the Insurance Commissioner. At no point did the *Higginbotham* Court evaluate whether an insured maintains his contractual rights as against his insurer for wrongful denial of a mine subsidence claim.

[3] Moreover, if the Legislature intended to remove any right of recourse by the insured against the insurer or BRIM, it surely would have indicated as much in that portion (continued . . .)

5

Therefore, BRIM's role as reinsurer in regard to petitioner's cause of action must be examined. As explained in *Higginbotham*, "[r]einsurance is defined as 'insurance purchased by one underwriter from another, the latter wholly or partially indemnifying the former against the risks that it has assumed. *The rights as between the underwriters are governed by the terms of the reinsurance contract.*'" 189 W. Va. at 510, 432 S.E.2d at 780 (quoting Windt, Allan D., *Insurance Claims and Disputes* § 7.10 (2d ed.1998)) (emphasis added); *see also Exec. Risk Indem., Inc. v. Charleston Area Med. Ctr., Inc.*, 681 F. Supp. 2d 694, 716-17 (S.D.W. Va. 2009) ("A reinsurance contract must be interpreted like any other contract to ascertain the intent of the parties[.]"). For purposes of reinsurance relationship, the original insurer's (or "reinsured's" or "ceding insurer's") contract with its own insured is "a separate and distinct contract[.]" 1 Couch on Ins. § 1:33, (Nov. 2023 update) (discussing "Reinsurance"). Likewise, it is well-established that "[a]n ordinary contract of reinsurance, in the absence of provisions to the contrary, operates solely as between the reinsurer and the reinsured." 46A C.J.S. *Insurance* § 2079 (March 2024 update) (discussing "Contract of reinsurance").

Therefore, the circuit court was patently incorrect when it found that because the statutory scheme and reinsurance agreement grant BRIM "the authority to investigate

---

of the statute governing "[r]ight of recourse"—West Virginia Code § 33-30-12. Instead, that statute provides only that BRIM has no right of recourse against the *insurer* except in the case of fraud, and that it may require the insurer to seek recovery for payments in the event of fraud or violation of policy conditions. *Id.* The statutory scheme may not— through its complete *silence* as to an insured's right of recourse—be read to strip an insured of well-established civil remedies.

6

and approve [petitioner's] claim[,]" Erie could not have breached its contract with petitioner. Petitioner stands in privity with Erie alone; he is a stranger to any secondary agreement between Erie and BRIM regarding claim investigation and settlement approval. It is well-established that "an original insurer cannot, without the knowledge or consent of the insured, enter into any contract of reinsurance with another company which abrogates or alters the rights of the insured against it, the insurer." *Exec. Risk Indem.,* 681 F. Supp. 2d at 716 (quoting 19 Couch on Ins. 2d § 80:64, at 670 (Rev. ed. 1983)). To the extent the Reinsurance Agreement creates rights and duties as between Erie and BRIM, that is a matter for Erie to pursue with BRIM under the terms of that contract or equitable principles. It does not, however, affect the contractual obligations between petitioner and Erie under the four corners of the insurance policy.

Along with its statement that the reinsurance relationship between BRIM and insurers is non-"traditional," the *Higginbotham* Court made an additional remark in dicta which appears to have contributed to the circuit court's misapprehension of the issues. The circuit court drew particular emphasis to *Higginbotham's* statement that "the insurer acts merely as an agent of the State and is bound by the Board's decisions[.]" 189 W. Va. at 510, 432 S.E.2d at 780. However, a reinsured or ceding insurer is not the "agent" of the reinsurer; they are separately contracting parties whose relationship is governed by that contract. As the United States Supreme Court explained:

> *[I]t is the ceding company that remains directly liable to its policyholders*, and that continues to pay claims and collect premiums. The indemnity reinsurer assumes no direct liability

7

> to the policyholders. Instead, it agrees to indemnify, or reimburse, the ceding company for a specified percentage of the claims and expenses attributable to the risks that have been reinsured, and the ceding company turns over to it a like percentage of the premiums generated by the insurance of those risks.

*Colonial Am. Life Ins. Co. v. Comm'r*, 491 U.S. 244, 247 (1989) (emphasis added).

The question then becomes: what recourse do the respective parties to these contractual relationships have for enforcement of their rights? This is where the majority's resolution is most demonstrably inadequate. Not only does remand for notice to the Attorney General fail to ensure BRIM's or the State's involvement (should the Attorney General decline to seek intervention), it fails to recognize that BRIM should be involved in the proceedings below not merely as an intervening "interested party" but as a *party in interest*. Because Erie has recourse against BRIM for any liability to petitioner under the terms of the Reinsurance Agreement, remand with leave to file a third-party complaint against BRIM would have been more appropriate.[4]

---

[4] However, regardless of whether Erie has express recourse under the terms of the Reinsurance Agreement, BRIM may also be liable to Erie for implied indemnity. As we have explained:

> The general principle of implied indemnity arises from equitable considerations. At the heart of the doctrine is the premise that the person seeking to assert implied indemnity. . . has been required to pay damages caused by a third party . . . . In the typical case, the indemnitee is made liable to the injured party because of some positive duty created by statute or the

(continued . . .)

8

More importantly, a review of relevant caselaw regarding the role of reinsurance would have demonstrated to the lower court that not only does the statutory reinsurance scheme not strip petitioner of his rights against his insurer, but it may actually create a cause of action against BRIM. As stated above, generally reinsurers are not liable to the original insured, however, there are exceptions to this rule—many of which may prove applicable here after further development and analysis. West Virginia long ago recognized this possibility. *See Delp v. Mo. State Life Ins. Co.*, 116 W. Va. 508, 182 S.E. 580, 581 (1935) ("The effect of a strictly technical contract of reinsurance is merely to indemnify the original insurer, and, accordingly, the policyholder is not in privity with the contract and may not sue the reinsurer by reason thereof; but where the contract of reinsurance is to pay the policyholder the amount of any loss which may accrue, it is

---

common law, but the actual cause of the injury was the act of the indemnitor.

Syl. Pt. 2, *Hill v. Joseph T. Ryerson & Son, Inc.*, 165 W. Va. 22, 268 S.E.2d 296 (1980). To whatever extent Erie claims its hands were tied by BRIM's decision-making, because of its first-party contractual obligation to its insured, its liability to petitioner was created by BRIM and presents a fairly classic scenario for application of the equitable doctrine of implied indemnity.

Moreover, to whatever extent BRIM claims immunity from suit, should Erie be held liable to petitioner for BRIM's claims handling determination, consideration could be made for Erie's assertion of a claim against it in the Legislative Claims Commission. *See* W. Va. Code § 14-2-13 ("The jurisdiction of the commission, except for the claims excluded by section fourteen, shall extend to the following matters: (1) Claims and demands, liquidated and unliquidated, ex contractu and ex delicto, against the state or any of its agencies, which the state as a sovereign commonwealth should in equity and good conscience discharge and pay[.]"); *cf., e.g., VanKirk v. Green Const. Co.*, 195 W. Va. 714, 466 S.E.2d 782 (1995) (involving contractual claim filed against DOH in Court of Claims and subsequent action in circuit court to resolve indemnity).

9

generally held that the policyholder may sue the reinsurer on the policy."). As one commentator has summarized:

> [R]einsurance contracts may be drafted in such a form and with such provisions as to create a liability on the part of the reinsurer not only to the reinsured insurer, but also directly to the original insured; thus, in a case where a contract of reinsurance is made for the benefit of the policyholders of the reinsured, the reinsurer assumes the liability of the latter upon its policies, and the liability of the reinsurer may be directly enforced by the insured or by his or her privies. An insured may bring a direct action against the reinsurer where a proper third-party beneficiary agreement to that effect may be found.

46A C.J.S. *Insurance* § 2087 (March 2024 update) (discussing "Rights of third persons under reinsurance policy"; *see also* Wall, Dennis J., "*Primary and excess insurers and reinsurers: A working definition of reinsurance—The effect of reinsuring agreements or treaties*" *Litig. & Prev. Ins. Bad Faith* § 6:11 (3rd ed. Aug. 2023) (describing four categories where "liability of a reinsurer to a ceding insurer's insured exists" including where reinsurer voluntarily undertakes duties of ceding insurer, where "reinsurer's conduct and the other circumstances concerning the issuance of the reinsuring agreement indicate an intention on the part of the reinsurer to benefit or to be bound to the ceding insurer's insured," or where other circumstances permit a finding of implied or quasi contract between insured and reinsurer); *Wiley v. Glickman*, No. A3-99-32, 1999 WL 33283312, at *13 (D.N.D. Sept. 3, 1999) (recognizing exception to general rule of non-liability for government reinsurer where contract is "'drawn in such form and with such provisions so as to create a liability on the part of the reinsurer directly to the original insured.'" (quoting *Ainsworth v. Gen. Reinsurance Corp.*, 751 F.2d 962, 965 (8th Cir.1985))); *Klockner*

10

*Stadler Hurter Ltd. v. Ins. Co. of State of Pa.*, 785 F. Supp. 1130 (S.D. N.Y. 1990) (finding that where reinsured was required "'to follow and be bound by the settlements made by leading reinsurers'" and dealt directly with insured, reinsurer consented to suit); *O'Hare v. Pursell*, 329 S.W.2d 614 (Mo. 1959) (where reinsurer "took over" the servicing of the original policies and dealt directly with insureds, insureds became third-party beneficiaries of reinsurance agreement); *J.C. Penney Life Ins. Co. v. Transit Cas. Co. in Receivership*, 299 S.W.3d 668, 674 (Mo. Ct. App. 2009) ("If the reinsurer assumes the liability of the reinsured company on its policies, then the policyholders, or their privies, may directly enforce this liability against the reinsurer."). Therefore, the nature of the reinsurance arrangement itself may give rise to liability as between the original insured and the reinsurer.

As the above cases also demonstrate, the reinsurer's *conduct* may likewise create such liability. In this case, the evidence reveals that both Erie and BRIM each independently undertook claims handling functions. Each retained a different expert to evaluate petitioner's mine subsidence claim, and each sent a denial of coverage letter. Throughout the underlying claims process and this litigation, each took overt acts of "ownership" of the claim and investigation while at the same time attempting to disavow the coverage decision and liability. And while both claim to merely be following the statutory and regulatory process for these claims, the underlying coverage determination cannot at once be both *everyone* and *no one*'s legal responsibility. Yet that is precisely the upshot of the circuit court's ruling below. The foregoing cases reveal the exact opposite:

that by virtue of the reinsurance arrangement as well as BRIM and Erie's actions, petitioner may not only have an action against his own insurer but potentially against the reinsurer as well.

This discussion should not be regarded as a conclusive declaration as to the efficacy or success of these legal theories or procedural options. Rather, what it demonstrates is the complete failure of the court below to examine—and the majority to address—the interplay between the mine subsidence statutory scheme against the backdrop of black-letter insurance and contract law. Instead, the circuit court seized upon a couple of pieces of (potentially misguided) dicta and disregarded the entire applicable body of law. What the court and parties below must address on remand—regardless of whether the Attorney General seeks to intervene—is what claims are available to petitioner as a first-party insured and what recourse is available to Erie to allocate any potential liability to BRIM after a full development and analysis of the statutory and contractual relationship between them. However, what is certain is that petitioner cannot be left without a remedy for a potential wrongful denial of coverage, nor can the court delegate its duty to protect petitioner's well-established right of action to the vagaries of the State's intervention. At base, the lower court ignored basic tenets of contract and insurance law leading to an untenable ruling where citizens of this State—for whose sole benefit the mine subsidence insurance statutory scheme was enacted—are potentially deprived of its essential purpose without recourse.

12

Accordingly, I respectfully concur, in part, and dissent, in part.